**AMERICAN LEGACY FOUNDATION,**
a Delaware non-profit corporation,
Plaintiff,

v.

**LORILLARD TOBACCO COMPANY,** a
Delaware corporation, Defendant.

**C.A. No. 19406.**

Court of Chancery of Delaware,
New Castle County.

Submitted: May 20, 2005.
Decided: Aug. 22, 2005.

4

Wright, Esquire, Karen E. Keller, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; John Payton, Esquire, David W. Ogden, Esquire, Stuart F. Delery, Esquire, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C.; Ellen Vargyas, Esquire, American Legacy Foundation, Washington, D.C., Attorneys for American Legacy Foundation.

Stephen E. Herrmann, Esquire, Steven J. Fineman, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Jim W. Phillips, Jr., Esquire, Robert J. King, III, Esquire, Charles E. Coble, Esquire, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, North Carolina, Attorneys for Lorillard Tobacco Company.

Don A. Beskrone, Esquire, Ashby & Geddes, P.A., Wilmington, Delaware; Michael C. Hefter, Esquire, Dewey Ballantine LLP, New York, New York, Attorneys for Amicus Curiae, The Citizens' Commission To Protect The Truth.

Joel Friedlander, Esquire, Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware; Attorneys for Amici Curiae Alaska, Arizona, Arkansas, Colorado, Connecticut, Georgia, Hawaii, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Dakota, Northern Mariana Islands, Oklahoma, Oregon, Puerto Rico, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.

Thomas G. Macauley, Esquire, Elizabeth D. Power, Esquire, Zuckerman Spaeder LLP, Wilmington, Delaware; William B. Schultz, Esquire, Alexandra W. Miller, Esquire, Zuckerman Spaeder LLP, Washington, D.C., Attorneys for Amici Curiae Campaign for Tobacco–Free Kids, Action on Smoking and Health, American Cancer Society, American College of Occupational and Environmental Medicine, American College of Preventative Medicine, American Dental Hygienists' Association, American Heart Association, American Lung Association, American Public Health Association, American School Health Association, American Society of Addiction Medicine, Association of State and Territorial Health Officials, American Thoracic Society, Community Anti–Drug Coalitions of America, Lung Cancer Alliance, National African American Tobacco Prevention Network, National Association of County and City Health Officials, National Association of Local Boards of Health, and National Latino Council on Alcohol and Tobacco Prevention.

### OPINION

LAMB, Vice Chancellor.

### I.

This litigation arises out of the historic 1998 tobacco settlement between the nation's largest tobacco companies and 46 of the states' attorneys general. In the settlement, the tobacco companies agreed to fund a foundation charged with creating programs to reduce youth tobacco product usage in the United States. As part of its mission, the foundation created a series of television and radio ads under the brand "the truth." [1]

The settlement agreement imposes certain limits on the content of the foundation's activities, including a requirement that its advertising not constitute a "per-

---

1. "The truth" is a registered trademark. For ease of reading, the court will omit the mark when referring to the ad campaign.

sonal attack on, or vilification of" any person or company. After the airing of one of the foundation's radio ads in 2001, a tobacco company threatened to take legal action against the foundation. Several months later, with the issue still unresolved and facing the threat of suit in multiple jurisdictions, the foundation filed an action in this court, seeking a declaration that none of its ads violate the settlement agreement. The tobacco company counterclaimed that the ads do violate the settlement agreement.

Both parties move for summary judgment, arguing that there is no genuine issue of material fact. They both agree that the matter presented is a straightforward contractual issue that turns on the legal interpretation of the words of the settlement agreement.

The restrictive terms used in the settlement agreement do not have well defined legal meanings. Nevertheless, drawing upon numerous sources, including case law, law review articles, and dictionaries, the court is able to ascertain the meaning of those terms and, then, to analyze the disputed advertisements in light of those meanings. As a result of this analysis, and for the reasons discussed below, the foundation's motion for summary judgment is granted and the tobacco company's motion for summary judgment is denied.

## II.

### A. Background

The defendant is Lorillard Tobacco Company, the oldest tobacco company in the United States and a Delaware corporation. The plaintiff is American Legacy Foundation ("ALF"), a Delaware non-profit corporation formed pursuant to the terms of the Master Settlement Agreement (the "MSA"), a 1998 agreement whereby the nation's largest tobacco companies settled lawsuits brought against them by the attorneys general of 46 states. The MSA requires that the tobacco signatories make collective Base Fund Payments of $25,000,000 per year for nine years. The MSA also requires the tobacco signatories to make collective payments in the amount of $250,000,000 in 1999 and $300,000,000 per year for the next four years for ALF's National Public Education Fund ("NPEF"). These funds have been used by ALF to produce its ad campaigns.

ALF's mission, as originally stated in the MSA and later incorporated into ALF's bylaws, is to educate America's youth about the dangers of tobacco products and to reduce the usage of tobacco products by young people. To fulfill its mission, ALF launched an advertising campaign universally known as "the truth" campaign. This campaign involved various television and radio ads aimed at young people that portray the negative side of tobacco products. To make sure that its ads were effective in reaching young people, ALF purposefully made them edgier and more confrontational than regular television and radio ads. Many ads could be described as "in your face" and "eye-catching."

The funding provided to ALF pursuant to the MSA did not come without restrictions. A majority of ALF's funding was earmarked for the public's education (i.e. advertising), and the content of that advertising is made subject to both requirements and prohibitions. The MSA required that the advertising concern only the "addictiveness, health effects, and social costs related to the use of tobacco products."[2] The MSA also prohibited the advertising from being a personal attack

2. Section VI(h).

or a vilification of tobacco company employees or tobacco companies.[3]

The relationship between ALF and the tobacco companies got off to a rocky start. In July 2001, Lorillard threatened litigation against ALF because of a radio ad that mentions Lorillard by name and implies that cigarettes contain dog urine. Lorillard initially threatened claims of defamation and unfair business practices against ALF, but later changed its position to assert that ALF"s ads were a breach of the MSA.

In a January 18, 2002 letter, Lorillard notified ALF that it intended to bring suit for a breach of the MSA. Lorillard could not, however, bring suit at that time due to a 30-day notice provision of the MSA. ALF, as a non-signatory to the MSA, was not similarly bound. Thus, after a Lorillard spokesman indicated that Lorillard might sue ALF in 46 different states, ALF sued first, filing this action in Delaware on February 13, 2002.

In its complaint, ALF seeks a declaratory judgment that its advertisements do not violate Section VI(h) of the MSA. ALF also seeks injunctive relief on the theory that the continuing threat of litigation from Lorillard, especially the possibility that it may need to defend itself in multiple jurisdictions, threatened irreparable harm to its ability to continue its day-to-day operations.

Lorillard counterclaims that ALF"s advertisements violate Section VI(h) of the MSA.

## B. Procedure

This opinion is the fourth in a series of opinions concerning the litigation between these parties.[4] In *Lorillard I*, the court held that ALF"s claims would be litigated in Delaware.[5] In *Lorillard II*, the court granted partial summary judgment in favor of Lorillard, finding that the MSA could be enforced against ALF even though it did not sign the agreement. In *Lorillard III*, the court granted a motion to compel certain documents, and denied a motion to compel other documents, all of which related to the contested advertisements.

Now, after years of litigation and several months before trial, both parties move for summary judgment, neither party contending that there is a material issue of fact. This opinion addresses those motions.

## C. The Dispute

Section VI(h) of the MSA is at the center of the dispute between Lorillard and

---

3. *Id.*

4. *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 2004 Del. Ch. LEXIS 157 (Del. Ch. Nov. 3, 2004) (*"Lorillard III "*); *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335 (Del. Ch.2003) (*"Lorillard II "*); *Am. Legacy Found. v. Lorillard Tobacco Co.*, 2002 WL 927383, 2002 Del. Ch. LEXIS 49 (Del. Ch. Apr. 29, 2002) (*"Lorillard I "*).

5. The parties have apparently never argued about which state's law governs the MSA. Pursuant to the MSA, it is "governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State." MSA at 135. Both parties cite to Delaware case law not only for the procedural rules of summary judgment but also for the substantive law of contract construction and interpretation. Moreover, ALF is a Delaware entity and the section of the MSA at issue has been incorporated into ALF's bylaws. *Lorillard I*, 2002 WL 927383, at *5, 2002 Del. Ch. LEXIS 49, at *15 ("Because both Lorillard and the Foundation are Delaware entities and the interpretation and enforcement of the Foundation's bylaws is an issue in this case, Delaware law is clearly applicable to at least some of the claims."). Therefore, the court will apply the law of Delaware to the MSA.

ALF. That section, titled "Foundation Activities," states, in relevant part, as follows:

> The Foundation shall not engage in, nor shall any of the Foundation's money be used to engage in, any political activities of lobbying, including, but not limited to, support of or opposition to candidates, ballot initiatives, referenda or other similar activities. The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.

The parties argue about three separate clauses in this provision: (1) the anti-vilification and personal attack clause; (2) the restriction of ALF to addressing the "addictiveness, health effects, and social costs related to the use of tobacco products" (the "three criteria clause"); and (3) the funding of ALF's advertisements. Each will be addressed in turn.

### 1. *Vilification And Personal Attack*

The fundamental argument between the parties is the meaning of the word "vilification" and the phrase "personal attack." [6] ALF defines vilification as "advertising that strikes out at tobacco companies or their employees with extreme intensity and contains untruthful information." [7] ALF defines a personal attack as "advertising that is hostile or aggressive in tone and addresses subjects that are strictly private—individual characteristics unrelated to the person's public role." [8] Applying these definitions to its advertisements, ALF contends that it has not violated the Section VI(h) of the MSA.

In contrast, Lorillard defines "vilification" and "personal attack" with less forceful terminology. Lorillard defines vilification as "the use of words or visuals that have the tendency to degrade, disparage, or lessen the standing of another." [9] Lorillard defines personal attack as "a negative depiction or hostile criticism of another." [10] Lorillard argues that under these definitions, ALF has violated Section VI(h) of the MSA.

### 2. *The Addictiveness, Health Effects, And Social Costs Related To The Use Of Tobacco Products*

ALF argues that all of the ads in question address the addictiveness, health effects, and social costs related to the use of tobacco products. ALF also maintains that Lorillard has challenged whether some of the ads meet this standard. [11] Although Lorillard appears to concede the issue, [12] the court will address the three

---

**6.** Indeed, in a table depicting which ads violate (i) vilification, (ii) personal attack, or (iii) the three criteria clause, the great majority of ads with which Lorillard takes exception are due to vilification and personal attack, not violation of the three criteria clause. *See* Pl.'s Ex. 43. Moreover, most of the ads that Lorillard indicates are in violation of the MSA are assertedly violative of both the vilification *and* personal attack prohibition. Lorillard does not argue that any ad vilifies without also personally attacking. And only in rare instances does Lorillard urge that an ad is personally attacking without urging that it also vilifies.

**7.** Pl.'s Opening Br. at 42.

**8.** *Id.*

**9.** Def.'s Opening Br. at 2.

**10.** *Id.*

**11.** Pl.'s Opening Br. at 2.

**12.** Def.'s Opening Br. at 59 ("Within [the second sentence of Section VI(h) of the MSA],

criteria clause and determine whether any of the ads violate it.

### 3. *The Funding Of ALF's Ads*

ALF argues that Section VI(h) treats the two sources of funds differently. It maintains that the first sentence relates to its Base Fund and that the second sentence relates to the NPEF. ALF claims that "the Base Fund, unlike the NPEF, is not subject to the constraints of either the three-criteria clause or the vilification/personal attack clause." [13] Thus, according to ALF, "as a matter of law, advertisements funded out of the Base Fund cannot violate those clauses." [14]

Lorillard disagrees with ALF's interpretation of the funding restrictions of Section VI(h). Lorillard argues that ALF is not permitted to use the Base Fund for any advertising or public education. Thus, Lorillard contends that if any ad received any of the Base Fund, either directly or indirectly, then ALF has violated Section VI(h). Lorillard asserts that ALF cannot prove that any ad was funded exclusively from the NPEF because of improper recordkeeping and inaccurate allocation of money received pursuant to the MSA.

### D. *The Ads*

For purposes of this motion, the parties stipulate that a determination of whether ALF has violated Section VI(h) of the MSA is confined to a select group of 20 ads. The parties chose this group of ads nearly a year ago, each side designating 10 ads. For the past year, the parties have conducted extensive discovery about those ads.

During the discovery process, ALF sought information from Lorillard that would prove or disprove the truth of the ads. Lorillard refused to provide the information, claiming that the truthfulness of the ads was not relevant to the court's analysis of the MSA as a contractual agreement. Indeed, Lorillard has not pointed to one fact in ALF's ads which has not been publicly admitted by either Lorillard or one of the other signatories to the MSA. For the purposes of this motion, if the court determines that truthfulness is relevant, Lorillard concedes that the court can assume all of the contested ads are true. [15] ALF maintains now that truth matters, although there is evidence of a memo written by its CEO that truth is not a defense to vilification. [16]

The ads are as follows, categorized by campaign: [17]

### 1. *Youth Voices Campaign*

a. *Shredder* [18]

In *Shredder*, two youths stand outside of an urban corporate building with a large machine described as the "Shredder 2000," which appears to be a large wood chipper. The building is identified only as a major tobacco company, although in reality it is

---

the only words that are apparently in dispute are 'personal attack' and 'vilification.' ").

13. Pl.'s Opening Br. at 81.

14. *Id.* ALF contends that it funded six of the 20 contested ads from the Base Fund: *Body Bags, Congress, Hypnosis, Lie Detector, Product Recall,* and *Shredder.*

15. Def.'s Answering Br. at 18.

16. *Id.* at 16.

17. Each ad has different versions. For simplicity, the court cites to only one version of each ad that reflects the content of the ad as it is understood by both parties. Additionally, all ads are television ads unless otherwise noted.

18. Pl.'s Ex. 7.

Philip Morris's headquarters.[19] The youths use megaphones to address employees[20] in the building, asking them if there are "a lot of embarrassing reports lying around the office." One of the youths then tells the employees that they "need" the Shredder 2000 to handle reports from the tobacco industry that say "today's teenager is tomorrow's potential regular customer." He then runs to the back of Shredder 2000 and throws what appears to be a report into the chipper. The report is instantly shredded. The youths also point out that the reports do not even need to be removed from where they are, shredding a file cabinet, a briefcase, and a computer. The ad concludes with a voice over that says "Shredder 2000—now available in regular and king-size."

b. *Hypnosis*[21]

In *Hypnosis,* three youths driving a truck "somewhere in tobacco suburbia" ask various passers-by where tobacco company executives live. Eventually, they find their way to a suburban housing development. The setting is at night and the houses have their interior lights on. Inside the van, the youths marvel at the size of the large homes, saying that working in an industry that kills over a thousand people a day pays "pretty well." Then they cue a pre-recorded tape linked to a public address system on top of the truck. On the tape, a woman's voice speaks in hypnotic monotone. The following are examples of what the voice says: "I am a good person;" "Selling a product that kills people makes me uncomfortable;" "I realize that cigarettes are addictive;" and "Tomorrow I will look for a new job." The ad ends with a youth announcing that they are "just trying to help."

c. *Body Bags*[22]

In *Body Bags,* an unmarked truck pulls up "outside a major tobacco company." A group of youths rush to the back of the truck, where the door opens. They begin to pull large bags out of the truck. The bags are marked in large block lettering "BODY BAGS." The youths stack the bags on the sidewalk next to the tobacco company building while employees[23] inside watch. The bags line two sides outside of the building. Then, using a megaphone, a youth asks the employees inside if they know how many people tobacco kills everyday. The answer is 1,200 people, according to the ad. The body bags represent each person killed everyday (i.e. 1,200 body bags). The ad ends with youths posting signs on poles that read: "Every day 1200 people die from tobacco."

d. *Lie Detector*[24]

In *Lie Detector,* several youths enter the building of "a major tobacco company" carrying a lie detector. They ask to see the vice president of marketing because they want to drop off a lie detector. The security guards in the lobby of the building do not let them in. The security guards then ask them to leave, at which point one of the youths points out that the tobacco company has switched its position from claiming that nicotine is not addictive to admitting that it is addictive.

---

19. This building is not identified by name in the ad. Def.'s Opening Br. at 68.

20. The employees are not identifiable because their faces are electronically obscured.

21. Pl.'s Ex. 7.

22. *Id.*

23. *See* note 20.

24. *Id.*

### 2. *Orange Curtain Campaign*

#### a. *SCUM* [25]

*SCUM* features what appears to be a homeless person reading a message directly to the viewer. He states that in the mid–1990s tobacco company executives created a marketing program that specifically targeted "gays and homeless people." The name of the program, he continues, was Project Sub–Culture Urban Marketing, "also known as Project SCUM." [26] The ad ends with the actor saying, sarcastically, "But I am sure they meant that in a good way." [27]

#### b. *Congress* [28]

In *Congress*, a young woman stands in front of the Capitol building with a memo in her hand. She states that in 1994, the top executive of a huge U.S. tobacco company testified before Congress that he did not believe that nicotine was addictive. Then she points to the memo, which she says is an internal memo from the same company that says that nicotine is addictive. She follows up by saying that the memo is from 1963. The ad ends with the woman saying that maybe the executive did not get the memo.

#### c. *Unclear* [29]

*Unclear* opens with a young man talking to the viewer about the testimony of a tobacco company executive, who said that he was unclear if anyone dies from cigarette smoking related diseases. As the young man continues in a voiceover, the ad shows him spray-painting a wall mural. When the mural is complete, the viewer can see it is a memorial to someone who lived from 1954 to 2002. The youth then says that it is his dad. The youth also says that his dad died from throat cancer due to smoking. He then asks the viewer if that is clear enough.

### 3. *Bags Over America Campaign*

#### a. *Western* [30]

*Western* opens with a bird's eye view of a corral of horses in what appears to be western America. Three youths pull body bags out of a truck and throw them over the horses' backs as if they are saddles. The youths then turn the horses loose. As the horses gallop away, a youth holds a sign that says "what if cigarette ads told the truth?" At the end of the ad, another of the youths says "Let's see them put that in a magazine."

#### b. *Night Club* [31]

In *Night Club*, a group of youths are dancing and enjoying themselves in what appears to be a pulsating night club. A narrator describes the scene positively and then states, "looks like a cigarette ad to me." The ad cuts to the narrator, who is a youth, standing next to a body bag and another youth. The youths carry the body bag through the crowd and up to the bar, where they tell it that a woman dancing on the dance floor is "checking [it] out." The dancers then part on the dance floor, revealing a person holding a sign that says "What if cigarette ads told the truth?"

### 4. *Infect Truth Campaign*

25. *Id.*

26. *Id.*

27. Pl.'s Ex. 7.

28. *Id.*

29. *Id.*

30. *Id.*

31. *Id.*

#### a. *Dog Walker* [32]

*Dog Walker*, a radio ad, begins with the ringing of a telephone. A woman answers "Good afternoon, Lorillard." [33] The caller asks to speak to someone about a "business idea." The caller announces that he is a professional dog walker and has noticed the waste of quality dog urine when dogs pee on fire hydrants and flowerbeds. He offers to collect the dog urine and sell it to the tobacco companies because, as he says, "dog pee is full of urea, one of the chemicals that [tobacco companies] put in cigarettes." He offers the woman samples from a Chihuahua, a Golden Retriever, and even, as he describes it, "high-test" pee from a Rottweiler. She then transfers the caller to someone else, who hangs up on him at the mention of a "pee proposal." [34]

#### b. *Flavor Gendek* [35]

*Flavor Gendek*, a radio ad, also begins with the ringing of a telephone. A person answers, "Hello?" The caller identifies himself as "Jeff" and says that he is taking a survey about a well known product. "Jeff" then asks the person to rate flavors on a scale of one to ten. The first three flavors are cocoa, licorice, and peppermint, all of which the person rates in the mid-range of the scale. Then "Jeff" asks about ammonia, which receives a zero. "Jeff" next asks about another chemical, which also receives a zero. Finally, when "Jeff" asks about a third chemical, the person asks, "What kind of stupid questions are these?" "Jeff" then informs the person that some tobacco companies add the chemicals to cigarettes.

#### c. *Ammonia Soul Train* [36]

In *Ammonia Soul Train*, a group of youths are dancing in what appears to be a game show backdrop. One of the youths has a microphone and is presumably a game show host. He introduces two other youths as "contestants." There is a "scrambleboard" in the background that contains several jumbled letters that do not spell a word. The host asks the contestants to unscramble letters and make a word that is a chemical used to clean floors and that tobacco companies add to cigarettes to increase the impact of nicotine. The contestants successfully rearrange the letters to spell "ammonia."

#### d. *Raspa* [37]

In *Raspa*, two youths are selling water ice from a vending cart. Customers appear and the youths ask them if they want to try a new flavor, ammonia. When the customer questions using ammonia as a flavor, the youths tell him that tobacco companies put ammonia in cigarettes for flavor "[w]hen in reality ammonia increases the impact of nicotine." The customer then asks if ammonia is risky or if anything bad can happen. In the end, he declines to eat the ammonia water ice.

---

32. *Id.*

33. When asked at the summary judgment hearing about the reference to Lorillard, counsel stated that the reference did not violate the MSA. Tr. at 108.

34. This is only one of two radio ads in the list of 20 disputed ads. Due to the nature of the medium, it is technologically possible to splice various phone calls together and make it appear as if it were one seamless conversation. Apparently, *Dog Walker* is the result of such a splice. ALF admits that the ad consisted of audio from more than one phone call. Pl.'s Answering Br. at 32.

35. Pl.'s Ex. 7.

36. *Id.*

37. Pl.'s Ex. 7. *Raspa* is in Spanish, but ALF has provided an English translation in their opening brief. Pl.'s Opening Br. at 75–76 n. 23.

## 5. Death And Disease Campaign

### a. Baby Invasion [38]

In *Baby Invasion*, a group of mechanical baby dolls crawls around an urban landscape. Each doll is wearing a diaper and an orange T-shirt. Their presence is overwhelming and soon passers-by are picking up the dolls and reading their T-shirts, which presumably are identical. The ad shows a close-up of a T-shirt, which has two sentences printed on it. The first sentence is a question, which asks "How do infants avoid secondhand smoke?" The second sentence, attributed to a tobacco executive, answers "At some point they begin to crawl."

### b. Body Bags Memorial [39]

*Body Bags Memorial* opens with a group of youths in Washington, D.C. One of the youths acts as the narrator, welcoming fellow Americans to a new memorial in the nation's capitol. The youths set about to create a new memorial for people who have died, namely tobacco customers. This "tobacco memorial" consists of a gigantic pile of body bags dumped in a vacant lot. Initially, the youths pile them up by hand, but eventually, there are so many bags that a conveyor belt must be used to continue stacking them higher. The memorial symbolizes tobacco's "loyal customers" who die every day. The ad also announces that the memorial is "so that everyone in America can see what Big Tobacco is really up to." When a passer-by asks what the bags are, a youth answers that "they're just mothers, fathers, sisters, brothers, friends." The ad ends with the line "if anyone finds this offensive, so do we."

### c. Product Recall [40]

In *Product Recall*, an actor portraying the "Tobacco Industry Chairman" gives a speech in which he says that tobacco companies are recalling all cigarettes. The date on the video is April 1, 2001. The actor says that there is "mounting evidence linking cigarettes to cancer, addiction, emphysema, heart disease, and premature death." He states that the tobacco industry takes responsibility for its products. Until the tobacco companies can, with a clear conscience, offer a cigarette that poses no health risk, the actor asserts, all cigarettes will be recalled. His reasoning for the recall is clear: the tobacco industry cares about consumers' health and consumers' trust. The ad then fades to black and the screen shows only the words "April fools" while a voiceover reads the words "April fools."

### d. Choice [41]

In *Choice*, the ad presents a close-up of a woman looking directly at the camera and not talking. She does not move during the entire ad, except for involuntary human movements like blinking. In a voiceover, a female narrator, presumably the woman on screen, says the following:

> My name is Linda. I smoked for 21 years and I am dying of emphysema. The tobacco companies say smoking is an adult choice. Today I am dying because of a choice I made when I was sixteen. * * * I am not going to get better. I am going to die.

As the narrator says "I am going to die," the woman's face fades away and the viewer is left looking at a blank white screen.

---

38. Pl.'s Ex. 7.

39. *Id.*

40. *Id.*

41. *Id.*

### 6. Tobacco Advertising

#### a. Bodega [42]

In *Bodega,* a group of youths enter a convenience store in a barrio. They repeatedly ask the store clerk why the cigarette ads are so low to the ground. For example, they point to ads for Camel and Marlboro cigarettes, which are clearly within a few feet of the floor, at or lower than a small child's line of sight. The ads are directly in front of the counter, so presumably every customer must face them before paying for any products. The ad ends with a close-up of the Marlboro ad.

#### b. Peer Pressure [43]

In *Peer Pressure,* two youths stand outside with an electronic sign that flashes different numbers. In the background is a jumble of children's voices. Various phrases flash on the screen. When put together, the phrases make the following sentence: "Tobacco advertising—it's like peer pressure with a $15,000,000 a day budget." The electronic sign provides the "15,000,000" number to complete the sentence.

#### c. Rip It Out [44]

In *Rip It Out,* the ad alternates between a young man on a couch in his apartment reading a magazine and a board room full of tobacco company executives listening to a report about the company's "phenomenal" rate of growth. As the young man reads the magazine, he rips out tobacco advertisements. Each time he rips out the ad, the executive giving the presentation in the boardroom hesitates and appears to lose his voice momentarily. Eventually, the executive can no longer speak. At the end of the ad, a voiceover implores viewers to "silence Big Tobacco's voice" by ripping out their ads from magazines.[45]

### E. The Creation Of "The Truth" Campaign

ALF's ad campaign was modeled on an earlier campaign in Florida that successfully reduced tobacco usage among young people. The campaigns were alike in that they marketed their ads under the brand "the truth." Indeed, the first employee hired by ALF was the director of Florida's campaign, Chuck Wolfe, who was hired as Executive Vice President and Chief Operating Officer. Under Wolfe's direction, ALF retained Crispin, Porter & Bogusky, the primary advertising agency for the Florida truth campaign. As Wolfe testified in his deposition, he went to work for ALF in order to expand Florida's successful campaign to a national scale.[46]

The key difference between the Florida campaign and ALF's campaign for the purposes of this litigation is that ALF is subject to the contractual provisions in the MSA. In an effort to ensure compliance with the MSA, ALF hired the law firm of Wilmer, Cutler & Pickering, now Wilmer Cutler Pickering Hale and Dorr ("Wilmer Cutler"), to review its advertisements.

As part of the review process, Wilmer Cutler devised a multi-factor test to evaluate whether an ALF ad, i.e. a draft ad not yet broadcast, violated the MSA. Some of the factors are as follows: (i) the qualitative nature of the ad's content, i.e. allegations of greed and untruthfulness; (ii) the

---

**42.** *Id.*

**43.** *Id.*

**44.** *Id.*

**45.** In order to protect ALF legally, the ad warns viewers to rip out ads only from those magazines that they own.

**46.** Wolfe Dep. at 27.

tone of the ad; (iii) whether the ad singles out individuals or specific tobacco companies; and (iv) the quantity of the criticism within the ad. Although there is some dispute about the derivation of the test, how many factors were included, and whether ALF formally adopted it, Wilmer Cutler did create a test to evaluate the ads and their possible violation of the MSA.

Using the test, Wilmer Cutler assigned each draft ad a risk rating as to whether the ad would potentially expose ALF to liability under the MSA. A low risk rating meant that the ad had a 1 in 10 chance of violating the MSA. A moderate risk rating meant that the ad had between a 1 in 10 chance and a 1 in 3 chance of violating the MSA. A high risk rating meant that the ad had a 1 in 3 chance of violating the MSA. Initially, ALF planned to require full board approval of any ad that received a moderate or high risk rating. ALF later changed its position, creating an Advertising Approval Committee for ads with a moderate risk rating.

The overall effect of Wilmer Cutler's involvement was to tone down or abandon ads that were found to have a high risk of liability. For example, an ad called *Kills 1/3*, which is not challenged in this motion, originally stated that the tobacco **industry** kills one third of the customers who use their product.[47] The ad was later changed to state that tobacco **products** kill one third of the customers. This minor change shifted the focus of killing customers from the industry to the product. Other examples of the effect of Wilmer Cutler's involvement include the ads *Conscience Patch, Tobacco Company, Interview (Version 3),* and *Uncle Ray Ray,* all of which

were abandoned due to their high risk rating.[48]

Wilmer Cutler's review process also led to the alteration of at least one ad that is disputed in this litigation, *Shredder*.[49] In the original draft ad, the script indicated that the documents to be shredded were incriminating evidence. As assessed by Wilmer Cutler, the draft ad was given a high risk rating, partly because of the implication that the documents were "incriminating." The final version calls the documents merely "embarrassing."

ALF argues that its two-step review process ensures that its ads are in compliance with the MSA. The first review is performed by Wilmer Cutler and the second review is performed by the Advertising Approval Committee. Through these reviews, ALF argues, draft ads are either approved as is or altered to conform to the MSA.

ALF implemented the two-step review process in response to the tobacco signatories' concerns about of the Florida truth campaign. As ALF knew, *Demon Awards*, a Florida truth campaign ad, was the reason that the tobacco companies sought a prohibition against vilification and personal attack in the MSA.[50] In *Demon Awards*, tobacco wins the award for Most Deaths in a Single Year, beating out other contestants like murder, suicide, and illegal drugs. *Demon Awards* is a parody of such glamorous award ceremonies as the Oscars and the Emmys and it features tobacco industry executives applauding when tobacco is nominated for its gruesome award. The audience also includes Hitler and Stalin, who join in the applause.

Although these Florida ads laid the groundwork for ALF's ads, ALF did not

47. *Id.* at 40–41; Ex. 103.

48. Pl.'s Answering Br. at 46–47.

49. *Compare* Def.'s Opening Br. Ex 141 *to* Def.'s Opening Br. Ex. 144.

50. Pl.'s Opening Br. at 19 n. 7

copy them. Instead, ALF expanded the general concept of Florida's campaign but implemented the two-step review process to make sure that its ads do not violate the MSA. In this manner, ALF attempts to produce ads that retain their effectiveness in convincing young people not to smoke, yet remain within the parameters spelled out in the MSA.

## III.

Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[51] When evaluating a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact.[52]

"A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant."[53] "If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight."[54]

Since ALF seeks a declaratory judgment, this court notes that "[t]here is a split of authority as to whether a plaintiff seeking a declaratory judgment bears the burden of persuasion or whether the burden of persuasion rests with the party who would have borne that burden had it been brought as a conventional action, i.e., the declaratory defendant."[55] In Delaware, "[t]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward."[56]

▆▆▆ Additionally, under Court of Chancery Rule 56(h), since neither party argues that there is a disputed material issue of fact, the court deems the cross-motions to be the equivalent of a stipulation for decision on the merits on the record submitted.[57] Thus, the usual standard of drawing inferences in favor of the nonmoving party does not apply.

## IV.

### A. *Contract Drafting*

"The principles of contract interpretation in Delaware are well settled."[58] "In construing the meaning of written contracts, the court's first obligation to the parties is to determine the nature and scope of the contractual rights and obligations they created and to enforce those rights and obligations in accordance with law."[59] "The court's ultimate guide in de-

---

51. CH. CT. R. 56(c); *see also Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

52. *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del.1977)).

53. *Tanzer,* 402 A.2d at 385.

54. *Id.*

55. *Rhone–Poulenc v. GAF Chemicals,* 1993 WL 125512, at *3, 1993 Del. Ch. LEXIS 59, at *7 (Del. Ch. Apr. 6, 1993).

56. *Id.*

57. CH. CT. R. 56(h) ("Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.").

58. *Interactivecorp v. Vivendi Universal,* 2004 WL 1516149, *9, 2004 Del. Ch. LEXIS 90, at *30 (Del. Ch. June 30, 2004).

59. *U.S. WEST, Inc. v. Time Warner Inc.,* 1996 WL 307445, at *9, 1996 Del. Ch. LEXIS 55, at *28 (Del. Ch. June 6, 1996).

termining those legal entitlements is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted."[60]

When a highly sophisticated company like Lorillard and a group of 46 of the nation's attorneys general sign a contract that includes two critical phrases, "personal attack" and "vilification," that have no accepted blackletter legal definition, the court presumes that there was an implicit agreement by the parties to avoid the use of legal terms of art.[61] For example, the parties could have easily replaced "vilification" with a well defined legal term that approximates its meaning taken from the torts of libel, slander, or defamation.[62] Each of those torts has a settled legal definition that would have allowed the parties to brief an extensive list of cases in support of their argument.[63] Instead, the parties are left with legally undefined terms that they attempt to define by resort to meanings found in various dictionaries. Each party cites no less than three dictionaries in support of its defini-

tion of "vilification." The same is true of personal attack.

■ While dictionary definitions are helpful and instructive, they are not precedent and this court need not rely on them, especially when, as in this case, there are sufficient usages in legal opinions to inform the court as to whether the advertisements in question violate the MSA. Moreover, a significant problem with the parties' dictionary arguments is that they are, at least in part, identical. That is, both parties rely on *exactly* the same dictionary definition, at times, to support divergent interpretations of the MSA. Yet neither party offers a suggestion as to how this court should rule when the "competing" dictionary definitions are actually the same definition.

"The primary rule of construction is [that] where the parties have created an unambiguous integrated written [contract], ... the language of that contract ... will control."[64] "Contract language is not ambiguous simply because the parties

60. *Id.* 1996 WL 307445, at *9, 1996 Del.Ch. LEXIS 55, at *28–*29.

61. As the court noted at the hearing, the choice of words almost raises a question as to whether the parties intended a dispute about Section VI(h) of the MSA to be justiciable. Tr. at 19. As this court said in *Lorillard II*, "the court notes that the parties to the MSA are sophisticated persons who can be expected to have considered the interaction of provisions across the MSA (and accompanying agreements) and the implications of including or excluding various terms and language in the MSA." *Lorillard II* at 346 n. 42.

62. The tie between vilification and the torts of libel, slander, and defamation is made clear in *Spence*, which cited back to *Rice*, "the seminal case" from 140 years before *Spence*, in its discussion of libel. *Spence v. Funk*, 396 A.2d 967, 971 (Del.1978) (referring to *Rice v. Simmons*, 2 Del. 417 (Del. Ct. of Errors and Appeals 1838)). As *Spence* declared, "*Rice v.*

*Simmons* has more than age to commend it." *Spence*, 396 A.2d at 972. "[*Rice*] embodies long settled law in this State, reaffirmed by [the Delaware Supreme Court in *Klein v. Sunbeam Corp.*, 47 Del. 526, 533, 94 A.2d 385 (Del.1952),] and its reasoning remains sound." *Id.* Despite this direct link to *Rice*, neither *Spence* nor *Klein* mentions the term "vilification."

63. For an extended discussion of libel, slander, and defamation, see *Spence*, 396 A.2d at 967. As *Spence* states, "defamation is ... that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." *Id.* at 969. "[L]ibel is written defamation and slander is oral defamation." *Id.* at 970.

64. *U.S. WEST*, 1996 WL 307445, at *9, 1996 Del.Ch. LEXIS 55, at *29–*30.

disagree on its meaning."[65] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[66] "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[67]

■ Another difficulty in this case is that the MSA prohibits the court from relying on any negotiation between the drafters of the agreement to determine the meaning of the words.[68] In other contract interpretation cases, the court is able to look to parol evidence to determine the parties' intent.[69] But here, given the MSA's prohibition against discovering into the drafters' negotiations, the court must confine itself to the express language of the contract.

**B.** *Defining Vilification*[70]

1. *Case Law*

a. *Delaware*

The word "vilify" first appears in Delaware case law over 150 years ago. In 1837, the Delaware Court of General Sessions[71] described blasphemy as "the open, public vilification of the religion of the country . . . [a] licentiousness endangering the public peace . . . tending to corrupt society, [] considered as a breach of the peace, and punishable by indictment."[72] The next year, the highest court in Delaware[73] described "to vilify" as to bring one "into hatred, contempt and ridicule."[74] Several years later, the Superior Court again used the term "to vilify," this time as part of a test to determine whether a publication is "libellous."[75] The "libellous" test was subsequently repeated in 1880 in

---

**65.** *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del.1997).

**66.** *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992).

**67.** *Id.*

**68.** Tr. at 35, 72–73.

**69.** *See, e.g., Rago v. Judge*, 1989 WL 25802, at *6, 1989 Del. Ch. LEXIS 29, *15–*17 (Del.Ch. Mar. 16, 1989).

**70.** Vilification is often improperly spelled "villification." The court has considered precedent including either spelling.

**71.** "The [Court of General Sessions] was abolished in 1951 and its responsibilities given to the newly reorganized Superior Court." http://www.state.de.us/sos/dpa/collections/aghist/2805.shtml

**72.** *State v. Chandler*, 2 Del. 553, 577–78 (Del. Ct. of General Sessions 1837) (quoting Pennsylvania law).

**73.** "The Delaware Supreme Court is Delaware's highest court."

http://www.state.de.us/sos/dpa/collections/aghist/1205.shtml "Established in colonial times as the highest appellate court, it lost much of its power after the 1792 constitution reorganized the judicial system." *Id.* From 1831 to 1897, the highest court in Delaware was the Court of Errors and Appeals. *See* http://www.state.de.us/sos/dpa/collections/aghist/1210.shtml. "The current Supreme Court was reestablished under the 1897 constitution, to assume the duties and functions of the former Court of Errors and Appeals." http://www.state. de.us/sos/collections/aghist/1205.shtml

**74.** *Rice*, 2 Del. at 428 ("Sir James Mansfield, in delivering the opinion of the court said 'there is no doubt that this was a libel for which the plaintiff in error might have been indicted and punished; because, though the words impute no punishable crimes, they contain that sort of imputation which is calculated to vilify a man, and bring him, as the books say, into hatred, contempt and ridicule.' ") (quoting British law).

**75.** *Layton v. Harris*, 3 Del. 406, 407 (Del.Super.1842) ("If the attending circumstances prove nothing one way or the other about the

two cases involving a set of newspaper publications. Both cases defined a publication as "libellous . . . if it tends to vilify, defame and injure the plaintiff." [76] Thereafter, there is a large time gap in the case law before the term "vilify" was described again, this time in 2001, in which vilifying referred to "assail[ing] people and institutions." [77]

While the preceding recitation of Delaware case law does not conclusively demonstrate a blackletter law definition of "vilification," it does offer a basic understanding of the term as it has been used historically. In the first instance, a court used "vilification" in a discussion about blasphemy. Then another court linked vilification to hatred, contempt and ridicule. Then, in the 1880 newspaper cases, the court used the term "vilify" in its discussion of publications in which the author called a company "a rotten and worthless fraud" "run by swindlers" who are "a pair of rascals, who ought to be in jail." [78] This handful of cases, which represents a comprehensive survey of Delaware law on the meaning of "vilification," [79] will form the backdrop for the court's understanding of "vilification" as it is used in other jurisdictions as well as in the MSA.

### b. The United States Supreme Court

The United States Supreme Court has frequently used the term "vilify" in its opinions, often in First Amendment cases. The most recent use was in a discussion about libel in *Phila. Newspapers v. Hepps*.[80] In that discussion, the Court stated that "[w]hile deliberate or inadvertent libels vilify private personages, they contribute little to the marketplace of ideas." [81] The Court made this statement in the context of a First Amendment discussion involving the famous *New York Times* case,[82] which itself quoted a passage from another United States Supreme Court case, *Cantwell v. Connecticut*.[83]

intent, then the intent must be gathered from the paper itself, and if that is libellous—if it tends to vilify, defame and injure the plaintiff—the inference of law as well as of common sense is, that such was the intention, and the publication is, therefore, taken to be malicious.").

76. *Croasdale v. Bright*, 11 Del. 52, 59 (Del.Super.1880); *Delaware State Fire & Marine Ins. Co. v. Croasdale*, 11 Del. 181, 195 (Del.Super.1880).

77. *Capano v. State*, 781 A.2d 556, 668 (Del. 2001) (stating how the defendant vilified others).

78. *Delaware State Fire & Marine,* 11 Del. at 181.

79. A few other cases refer to the term "vilify" or "vilification," but they offer absolutely no information about the meaning of the contested terms. *See Lorillard I* (explaining the MSA); *Lorillard II* (explaining the MSA); *Piasecki Aircraft Corp. v. Int'l Union, United Auto., etc.,* 129 A.2d 663, 666 (Del.Ch.1957)

("While it is obvious that the claimed termination of the Bellanca–Union contract was followed promptly by vilification of those workers, supervisory personnel and suppliers, who passed defendants' picket line, it appears that picketing by Local 840 in recent weeks has been regulated and controlled by its own officials and that a labor force equivalent in size to that employed prior to November 23, 1956, is entering and leaving plaintiff's plant more or less on schedule.").

80. 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

81. *Id.* at 782, 106 S.Ct. 1558.

82. *New York Times Co. v. Sullivan*, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

83. 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (holding unconstitutional a Connecticut statute under which the defendants were convicted of promoting their religious beliefs).

*Cantwell* appears to be the origin for many of the United States Supreme Court cases that use the terms "vilify" or "vilification." The oft-cited passage from *Cantwell* is as follows:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.[84]

A review of state and federal case law shows that at least 30 opinions have quoted the sentence from *Cantwell* that contains the word "vilification," including six United States Supreme Court opinions.[85] Those half-dozen opinions include well known First Amendment cases such as *Feiner v. New York,*[86] *New York Times v. Sullivan,*[87] and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council.*[88]

In addition to *Cantwell* and its progeny, other United States Supreme Court cases also refer to vilification. In each of these cases, the Court used the term "vilification" to mean something stronger than mere disparagement.[89] In addition, many of the United States Supreme Court cases appear in contexts that have serious social implications. Such contexts, like race-based threats,[90] blasphemy,[91] and pro-German communications during World War II,[92] are beyond the commercial advertising complained about here by Lorillard.

**84.** 310 U.S. at 310, 60 S.Ct. 900.

**85.** One of the federal cases that cites the *Cantwell* discussion about vilification is a Third Circuit case about a Wilmington police department directive. *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 227 (3d Cir.2004).

**86.** 340 U.S. 315, 329, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (Black, J., dissenting) (discussing whether a public speaker incited a crowd of onlookers with racially charged comments).

**87.** 376 U.S. at 271, 84 S.Ct. 710 (deciding whether a public official can recover for defamatory falsehoods relating to the public official's official conduct).

**88.** 425 U.S. 748, 780, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (Stewart, J., concurring) (discussing the free flow of information concerning the price of prescription drugs).

**89.** *See, e.g., Mayberry v. Pennsylvania*, 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (equating "vilified" with "cruelly slandered"); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 294, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (Powell, J., dissenting) (discussing union officials subjecting letter carrier scabs to "public ridicule and vilification"); *Linn v. United Plant Guard Workers*, 383 U.S. 53, 67–68, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (Black, J., dissenting) (including "vilification" in a list with "invective" and "exaggeration").

**90.** *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 894, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (analyzing a Mississippi Supreme Court's judgment that "many black citizens were intimidated by threats of social ostracism, vilification, and traduction").

**91.** *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 539, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (citing a dictionary definition of blasphemy that defined blasphemy as "the denying or vilifying of the Deity, by speech or writing").

**92.** *Hartzel v. United States*, 322 U.S. 680, 692, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944) (Reed, J., dissenting) (describing pro-German pamphlets, which contained "scurrilous and vitriolic attacks," as vilifying Jews during World War II).

### c. *Other Legal Sources*

An analysis of state and federal case law demonstrates that those jurisdictions use the term "vilification" in a manner that is consistent with both Delaware and the United States Supreme Court.

First, state and federal case law shows that courts often use the term "vilification" to describe statements that are stronger than disparagement. For example, racial slurs, insults and epithets have been described as vilification.[93] In another case, a court described an allegation of rape committed in the presence of the victim's sister as vilification.[94] Also, in a heavily cited case from New Jersey, a court used the term "vilification" to describe allegations that a nursery school teacher had sexually abused her students.[95] These statements indicate that courts treat the term "vilification" much more seriously than mere disparagement.

Second, courts often use the term "vilification" in contexts that implicate serious social issues not found in commercial marketing. The term "vilification" is frequently found in case law involving racially charged issues.[96] "Vilification" is also found in case law dealing with sexual orientation.[97]

Additionally, a survey of leading law reviews and journals supports the use of "vilification" in the case law. More than 20 years ago, the Yale Law Journal included a definition of the word "vilifies" in an article on group vilification.[98] As the article states, " '[v]ilifying' speech has been defined as any utterance that, directly or by innuendo, holds up the target of the utterance to 'public contempt, hatred, shame, disgrace, or obloquy,' or that causes the target or its members to be 'shunned, avoided, or injured' in business, profession or occupation." [99] The article used this definition in a discussion about the Nazi Party of America's attempt to march in Skokie, Illinois, an event made infamous in a 1977 First Amendment case.[100] The Yale Law Journal article states that "the public dissemination of speech [by the Nazi Party] vilifies large and identifiable racial, ethnic, or religious groups." [101] According to the same article, vilification is not restricted to racial, ethnic, or religious slurs. Vilification may also take the form of accusations of "sexual

---

93. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir.2001).

94. *United States v. Burke*, 80 F.3d 314, 317 (8th Cir.1996).

95. *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372 (1994).

96. *See, e.g., Good News/Good Sports Club v. School Dist.*, 28 F.3d 1501, 1517 (8th Cir. 1994) (labeling a black speaker's words vilification when he labeled Jews "bloodsuckers of the black nation"); *Snell v. Suffolk County*, 782 F.2d 1094, 1098 (2d Cir.1986) (including in its list of vilifications " 'study guides' for minority officers comprised of puzzles commonly found in children's books, as well as a questionnaire for black officers containing virtually every conceivable racially offensive cliché").

97. *See, e.g., Centola v. Potter*, 183 F.Supp.2d 403, 410 (D.Mass.2002) (classifying as vilification assertions by co-workers that an assumed homosexual should be more "manly").

98. Note, *Group Vilification Reconsidered*, 89 YALE L.J. 308, 308 (1979).

99. *Id.* at 308 n. 2 (quoting, in part, Note, *Statutory Prohibition of Group Defamation*, 47 COLUM. L.REV. 595, 609 (1947)).

100. *Village of Skokie v. Nat'l Socialist Party of Am.*, 51 Ill.App.3d 279, 9 Ill.Dec. 90, 366 N.E.2d 347 (1977), *aff'd in part and rev'd in part*, 69 Ill.2d 605, 14 Ill.Dec. 890, 373 N.E.2d 21 (1978).

101. *Group Vilification Reconsidered*, 89 YALE L.J. at 308.

**24**

crimes and deviations."[102]

Other law reviews and journals also contain articles that use the terms "vilify" or "vilification." Most of these references to vilification are addressed to specific subject matters, such as race relations,[103] politics,[104] gender relations,[105] and religion.[106] Each of these subject areas is more serious than the commercial ads complained about by Lorillard.

In summary, the state and federal case law, as well as law reviews, support a view of vilification that is consistent with Delaware law. First, on a textual level, the words of vilification are stronger than dis-

**102.** *Id.* at 310 n. 9 (citing *Neiman–Marcus v. Lait*, 13 F.R.D. 311, 312 (S.D.N.Y.1952)).

**103.** *See, e.g.,* J.M. Balkin & Sanford Levinson, *The Canons of Constitutional Law*, 111 HARV. L.REV. 963, 976 (1998) ("Few constitutional scholars believe that the principles or the holding of *Dred Scott [v. Sandford*, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1857),] are important for modern constitutional theory (except perhaps as a symbol continually to be vilified)."); Robert A. Sedler, *The Unconstitutionality of Campus Bans on "Racist Speech:" The View From Without and Within*, 53 U. PITT. L.REV. 631, 661 (1992)("*UWM Post[v. Board of Regents of the Univ. of Wis. Sys.*, 774 F.Supp. 1163 (E.D.Wis.1991)] makes it clear then that narrow bans on racist speech, such as those that are limited to 'direct, face-to-face racial insults' and 'targeted vilification,' as proposed by Professor Charles Lawrence, also violate the First Amendment."); Michael J. Klarman, *Bush v. Gore Through the Lens of Constitutional History*, 89 CAL. L.REV. 1721, 1756 (2001) ("Thus, a Court decision that is initially popular or that generates a mixed response can later become so universally criticized as to subject the Court to popular vilification. *Dred Scott* and *Plessy* surely illustrate this phenomenon, and *Korematsu* may as well.").

**104.** *See, e.g.,* Richard J. Baker, Note, *Constitutional Law: State Campaign Contribution Limits: Nixon v. Shrink Missouri Government PAC: An Abridgment of Freedom in the Name of Democracy*, 54 OKLA. L.REV. 373, 390 (2001) ("Therefore, neither [the view of the civic republican nor the view of the populist] should be vilified as democracy-destroying corruption for the purpose of absconding First Amendment rights."); Stewart Jay, *Origins of Federal Common Law: Part One*, 133 U. PA. L.REV. 1003, 1037 (1985) ("Throughout the entire episode the character of Jay was thoroughly vilified, and Republicans repeatedly portrayed him as aristocratic and biased toward England.").

**105.** *See, e.g.,* Katherine M. Franke, *The Domesticated Liberty of Lawrence v. Texas*, 104 COLUM. L.REV. 1399, 1418–19 (2004) ("Might there be something politically valuable in resisting the transformation of the gay political subject from pervert to domesticated couple? What political projects are foreclosed by the vilification of the notion of perversion in the gay community?"); Richard F. Duncan, *Who Wants to Stop the Church: Homosexual Rights Legislation, Public Policy, and Religious Freedom*, 69 NOTRE DAME L.REV. 393, 415 (1994) ("Of course, proponents of the homosexual agenda have every right to wage a propaganda campaign to promote social acceptance of the gay lifestyle and even to vilify traditional religion."); Jeffrey G. Sherman, *Love Speech: The Social Utility of Pornography*, 47 STAN. L.REV. 661, 664 (1995) ("And unfortunately, the anticensorship forces likewise have taken up this dubious weapon of personal disparagement upon occasion, insinuating that antipornography feminists are simply bitter, ill-favored women who cannot find husbands and therefore inveigh against conspicuous images of women more alluring than they. This kind of vilification, whether employed by the pro-or the anticensorship forces, has no place in a reasoned discussion of the issue.").

**106.** *See, e.g.,* Leonard Pertnoy & Daniel Gordon, *Would Alan Dershowitz Be Hired to Teach Law at a Catholic Law School? Catholicizing, Neo–Brandeising, and an American Constitutional Policy Response*, 23 SEATTLE UNIV. L.REV. 355, 377 ("As early as St. Augustine, the Catholic Church vilified Jews, reinforcing images of Jews as rejected people."); Michal R. Belknap, *God and the Warren Court: The Quest for "A Wholesome Neutrality,"* 9 SETON HALL CONST. L.J. 401, 410 (1999) ("In its most famous defense of the rights of this often vilified sect, the Court held in *West Virginia Board of Education v. Barnette* that Jehovah's Witness children attending public

paragement. Second, on a contextual level, the term "vilification" is most often used to describe situations that implicate serious social issues, such as race or gender relations.

While the overwhelming majority of legal sources show a consistent use of "vilification" that is stronger than mere disparagement and frequently "vilification" is used in serious social contexts, there are a small minority of cases that appear to use "vilify" in a watered-down manner. For example, Lorillard cites cases that appear to use "vilify" to mean disparage or lower in standing.[107] These cases are few and far between and will not be relied on by this court.

### 2. Dictionaries

Both parties rely heavily in their briefing on dictionary definitions of "vilification." They both argue that "vilification" is not a legal term of art and has not been defined in any relevant case law.[108] Thus,

the parties request that the court confine its analysis to the "usual and ordinary meaning" (i.e. dictionary definition) of "vilification" in order to interpret the MSA properly.[109] Although the parties may agree that an analysis of leading dictionaries provides the proper method of interpretation, they do not agree on the meaning of the dictionary definitions of "vilification."

ALF claims that dictionaries describe vilification as "false, abusive, and . . . communicated with extreme intensity."[110] ALF looks first to the *American Heritage Dictionary*, which defines "vilify" as "[t]o make vicious and defamatory statements about."[111] ALF then quotes the *Oxford English Dictionary*, which defines "vilify" as "to depreciate with abusive or slanderous language; to defame or traduce; to speak evil of."[112] Finally, ALF quotes the *Random House Dictionary*, which defines "vilify" as "to speak ill of; defame; slander."[113] ALF argues that these defini-

---

schools could not be required to salute the American flag.").

107. Def.'s Supplemental Br. at 5 (citing, among others, *West v. State*, 793 So.2d 870, 883 (Ala.Crim.App.2000); *Allied Aviation Serv. Co.*, 248 N.L.R.B. 229, 230 (N.L.R.B. 1980)).

108. Pl.'s Supplemental Br. at 1 n. 1 ("Neither party in this case has ever suggested that the pertinent terms are legal terms of art or have a settled legal definition."); Def.'s Answering Br. at 1 ("Neither party contends that personal attack or vilification are terms of art or are somehow used in the MSA in a sense other than their usual and ordinary ones."). But in its supplemental briefing, Lorillard cites *Vanasco v. Schwartz*, which states that "[t]o vilify can mean to make 'less valuable or important,' and 'lower in estimation.'" 401 F.Supp. 87, 96 n. 18 (E.D.N.Y.1975), *aff'd*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Unabridged) 2552 (1966)). Def.'s Supplemental Br. at 3. Notably, the *Vanasco* court says *can* mean, not *does* mean.

109. Pl.'s Supplemental Br. at 1 n. 1 ("The parties agree, therefore, that the usual and ordinary meanings of the terms are the proper starting points here."). After the summary judgment hearing on May 10, 2005, the court requested that both parties provide supplemental briefs on the legal meanings of "vilification" and "personal attack" since most of the pre-hearing briefing focused on non-legal dictionary definitions.

110. Pl.'s Opening Br. at 44. In its supplemental brief, ALF describes vilification as "speech acts that are abusive in tone and that contain false statements or express unfair condemnation." Pl.'s Supplemental Br. at 1.

111. *Id.* at 44 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1919 (4th ed.2000)).

112. *Id.* at 44 (quoting OXFORD ENGLISH DICTIONARY 630 (2d ed.1989)).

113. *Id.* at 44 (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2122 (2d ed.1987)).

tions provide the proper meaning of the word "vilification" in the MSA.

Lorillard cites to dictionaries, some of which are the same as those relied on by ALF. For example, Lorillard quotes from the *American Heritage Dictionary* which defines "vilify" as "[t]o make vicious and defamatory statements about."[114] Although Lorillard quotes an older version of the *American Heritage Dictionary*, it uses the *exact same language* relied on by ALF for its definition of "vilification." Lorillard also cites to the *Oxford English Dictionary*, another source used by ALF, to demonstrate that "vilify" is "derived from the Latin vilificare and vilis, which means cheap or base."[115] In addition to these two dictionaries, Lorillard cites the following three dictionaries:

- *Webster's Third New International Dictionary of the English Language* (Unabridged) (3d ed.1993) (defining "vilify" as "To make less valuable or important: lower in estimation. To make morally despicable or abhorrent: degrade.")
- *Webster's Ninth New Collegiate Dictionary* (1987) (defining "vilify" as "To lower in estimation or importance. To utter slanderous and abusive statements against: Defame.").
- *The New Oxford American Dictionary* (2001) (defining "vilify" as "Speak or write about in an abusively disparaging manner: he has been vilified in the press.").

The "clear" result of these definitions, according to Lorillard, is "that the touchstone of vilification is the use of words that have a tendency to lower in standing or debase the target of the vilifying statement."[116]

### 3. What Is Vilification?

As the foregoing review of case law, law reviews, and dictionaries demonstrates there is no blackletter law definition of vilification. What is clear is that there is a range of meanings for vilification, both in the legal and nonlegal contexts.

■ In order to determine the meaning of the word "vilification" for the purposes of the MSA, the court begins with the use of vilification in Delaware case law. As summarized above, Delaware courts have used "vilification" in conjunction with words like blasphemy, licentiousness, hatred, contempt, and ridicule. "Vilification" has also been used in two related cases that concerned an alleged fraud by swindlers who perhaps should have been put in jail. From these sources, it is clear that Delaware law regards vilification as stronger (i.e. more contemptuous or malicious) than disparaging someone.

Looking to other jurisdictions, the court notes that a few cases appear to treat the term "vilification" no differently than criticism. But these cases are the minority and inconsistent with Delaware's jurisprudence. As *Spence* declared, the seminal libel case of *Rice v. Simmons* has "more than age to commend it."[117] While *Rice* does not define vilification, it links vilification to "hatred, contempt, and ridicule"[118] and provides a starting point for any analysis of vilification in this state.

---

114. Def.'s Opening Br. at 62 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992)).

115. *Id.* at 62 (citing OXFORD ENGLISH DICTIONARY (2d ed.1989)).

116. Def.'s Opening Br. at 62.

117. *Spence,* 396 A.2d at 972 ("[*Rice*] embodies long settled law in this State ... and its reasoning remains sound.").

118. *Rice,* 2 Del. at 428.

More generally, the United States Supreme Court, federal case law, and state case law are consistent with the stronger meaning of vilification found in Delaware law. An overwhelming percentage of references to vilify or vilification are stronger than, if not much stronger than, disparage. A survey of the relevant case law shows that vilification is often found in cases that deal with racial slurs, allegations of sexual impropriety (including abuse), and denigrating religions. These subject matters are not mere disparagement. They are much more hateful, much more personal, and much more disturbing than the usual meaning of disparage.

Similarly, although of less importance, the great majority of law review articles that use the term "vilification" do so in the context of serious social and political debate. The issues of racism, political power, gender and sexual equality, and freedom of religion are galvanizing issues for everyone. The arguments that surround these issues are often highly emotionally charged and full of strong language that goes far beyond mere disparagement. Differing viewpoints on these issues are much more intense and personal than in the commercial setting, where competitors routinely argue about the superiority of their products. For example, no one can reasonably compare a statement that a cigarette is the "best" cigarette to the statement that one religion is the "best" religion. This is not to say that there are no examples of "vilification" in the commercial setting, because there are.[119] But even commercial examples of vilification are mostly confined to social settings with highly emotionally charged debate, such as Third World access to HIV/AIDS drugs. Nowhere does a company that simply makes a bad product seem to be "vilified."

The court recognizes that examples can be found indicating that vilification is commonplace.[120] Nonetheless, the overwhelming majority of references to vilification are directed at much more serious topics, such as violations of human dignity. Moreover, as one law review notes, "the United States allows all forms of rudeness ... ensuring that few opinions are suppressed in the marketplace of ideas."[121]

■ Another point about vilification is that it appears to be based, at least in

119. *See, e.g.*, Barbara Cochrane Alexander, Note, *Lack of Access to HIV/AIDS Drugs in Developing Countries: Is There a Violation of the International Human Right to Health?*, 8 Hum. Rts. Br. 12, 14 (2001) ("Pharmaceutical corporations feel vilified by criticisms that they value patents more than human lives, but perhaps they fail to realize that limited price reductions of drug treatments are not sufficient to address the scope of the HIV/AIDS epidemic."); Dmitry N. Feofanov, *Luna Law: The Libertarian Vision in Heinlein's The Moon Is a Harsh Mistress*, 63 Tenn. L.Rev. 71, 98 (1995) ("It is easier to vilify 'big, evil corporations,' than widows and orphans who might be the actual corporate owners."); Dan Hunter, *Culture War*, 83 Tex. L.Rev. 1105, 1116 (2005) ("American pharmaceutical manufacturers were widely vilified—they were even caricatured on The West Wing—because they refused to provide drug therapies for HIV/

AIDS in Africa for anything less than their patent-monopoly controlled price.").

120. *See, e.g.*, Robert F. Nagel, *Privacy and Celebrity: An Essay on the Nationalization of Intimacy*, 33 U. Rich L.Rev. 1121, 1124–25 (2000) ("Profanity, fighting words, group vilification, and other forms of speech that were once suppressed are now as routine as bumper stickers.").

121. *See, e.g.*, Winfried Brugger, *Ban On or Protection of Hate Speech? Some Observations Based on German and American Law*, 17 Tul. Eur. & Civ. L.F. 1, 10–11 (2002) (in a discussion about vilification, comparing "the drawing of the state prime minister of Bavaria as a copulating pig" in a German case with the famous *Hustler* case involving the Reverend Jerry Falwell purportedly having sex with his mother in an outhouse).

part, on the target of the words, akin to the victim of defamation. Obviously racial epithets vilify people only of the targeted race. Similarly, masculine slurs vilify men and feminine slurs vilify women. Here, the company claiming vilification is a tobacco company. Lorillard is a member of an industry that has been under attack since the 1960s, when the first warnings from the Surgeon General were published.[122] In order to conform to federal law, Lorillard has for years printed warnings about the adverse health effects of smoking on its own cigarette packaging. Effectively, Lorillard has for years been running an ad campaign on cigarette packaging that disparages, at least implicitly, smoking, the tobacco industry, and Lorillard.

■ The court notes that the truthfulness of the ads, while not a complete defense to Lorillard's claims, is pertinent to the issues here. ALF has maintained from the beginning of this litigation that all of the facts in the ads are true. And, in a procedural maneuver, Lorillard has decided not to contest ALF's position for purposes of this motion. Lorillard's position that the truthfulness of the ad does not factor into the court's decision is incorrect. For example, if someone were to call someone else a thief, the court should look at the record evidence of whether the person had been arrested or convicted of being a thief before determining whether the accusation might be vilifying.

Lorillard's status as a tobacco company does not preclude it from being vilified, but any alleged violation of the anti-vilification clause of the MSA should be analyzed in context. For example, if ALF's ad campaigns contained only the federally-mandated warning that cigarette smoking is dangerous to your health, would Lorillard seriously claim that the ads violate the anti-vilification clause of the MSA? How would Lorillard argue that such an ad campaign lessened its standing in society when millions of people see that warning label everyday? More to the point, how could ALF carry out its mission of educating the public about the "health effects[] and social costs related to the use of tobacco products"[123] without mentioning the increased risk of disease and death due to tobacco use? Clearly, the public is aware, in general, of the dangers of smoking.[124]

Although it refuses to admit as much, ALF's actions indicate that it agrees that Lorillard can be vilified. For example, ALF's retention of Wilmer Cutler to review its ads for compliance with the MSA demonstrates an understanding, at least implicitly, that ads can cross the line and violate Section VI(h). A good example of such an ad is the *Demon Awards* from the Florida truth campaign. In *Demon Awards*, tobacco products are equated with suicide, murder, and illegal drugs. This ad is an extreme example of getting an anti-tobacco message across to the viewer and would be a violation of the MSA if ALF had produced it. Indeed, ALF acknowledges that *Demon Awards*

122. http://www.cdc.gov/tobacco/sgr/sgr_2000/factsheets/ factsheet_labels.htm ("The Federal Cigarette Labeling and Advertising Act of 1965 (Public Law 89–92) required that the warning 'Caution: Cigarette Smoking May Be Hazardous to Your Health' be placed in small print on one of the side panels of each cigarette package. The act prohibited additional labeling requirements at the federal, state, or local levels.").

123. MSA § VI(h).

124. "CDC: Smoking deaths cost $92 billion," *at* http://www.cnn.com/2005/HEALTH/conditions/ 06/30/smoking.deaths.ap/index.html (last visited July 14, 2005).

was the single reason why the tobacco companies negotiated Section VI(h)'s anti-vilification clause.

That being said, the court notes one final item about the tone of the ads. The parties take wildly divergent positions as to whether tone should be part of this court's analysis. ALF maintains that tone is a critical part of the analysis, citing the key adjective modifiers in its definitions, such as *abusive* language, *vicious* statements, *hostile* comments, and *bitter* words.[125] Without the modifying adjectives, ALF contends, the nouns themselves cannot be vilification. Thus, ALF argues against an analysis of the words themselves devoid of the surrounding context. ALF's position appears to carve out a safe harbor for all ads that are humorous, light-hearted, or comical.

At the other end of the spectrum, Lorillard takes the position that tone does not matter, only the words do.[126] Lorillard contends that "the definitions of vilification go to the content of the communications, not its manner of delivery."[127] Furthermore, Lorillard points out that there is nothing in the MSA that discusses tone.

■ The court finds that the proper analysis of whether an ad violates Section VI(h) must incorporate some consideration of tone. As ALF points out, a joke is completely different than a serious accusation. But Lorillard also makes a valid point that ALF has conveniently found humor, irreverence, or satire in every one of its ads. There must be some middle

ground for a proper understanding of the ads. Here, both parties have taken polar opposite positions. Neither is correct.

Therefore, in its analysis of the ads, the court will take into account tone. However, tone will not necessarily provide an ad with a safe harbor. For example, *Demon Awards* is a parody of an awards show and a parody does have an element of humor. But the element of humor can be lost in the socially offensive comparison to murder and suicide. If, on the other hand, an ad is substantially humorous, but does mention that tobacco kills 1,200 people per day, that ad is most likely not a violation of the anti-vilification clause.

### 4. Did ALF Violate The Anti–Vilification Clause Of The MSA?

The court now reviews each of the 20 ads to determine if any of them contravene the anti-vilification clause of the MSA.[128]

#### a. *Shredder*

■ The youths in *Shredder* refer to tobacco industry reports targeting potential teenager consumers, calling the reports "embarrassing." Lorillard contends that the discussion of the reports focuses on the employees' behavior and not on tobacco products. Lorillard claims that *Shredder* has "the tendency to disparage and lessen the standing . . . of tobacco companies generally."[129] While *Shredder* may be critical of tobacco companies and their employees, it does not rise to the level of vilification. Nothing in the ad lessens the standing of the tobacco compa-

125. Pl.'s Reply Br. at 2–3.

126. Def.'s Answering Br. at 6–7 ("There is nothing whatsoever in the language of Section VI(h) to support the notion that the manner in which a message is communicated—as opposed to the content of the message itself—determines whether an act constitutes a personal attack or vilification.").

127. *Id.* at 8.

128. In its briefing, Lorillard concentrates its efforts on five ads: *Shredder, Hypnosis, Product Recall, Dog Walker,* and *SCUM.* For these ads, Lorillard provides detailed analysis.

129. Def.'s Opening Br. at 68.

nies any more than the existence of the reports themselves. Simply making the public aware of the reports and expressing a characterization or opinion does not constitute a violation of the MSA.

Additionally, the criticism implied by the youths' statements is offset by the humor involved in shredding various ridiculously oversized objects, like a briefcase and a file cabinet. Indeed, the "shredder" in the ad is clearly a wood chipper and not a shredder. These facts all point to the inescapable conclusion that *Shredder* is a humorous ad accentuated by the absurdity of shredding unshreddable objects.

### b. *Hypnosis*

■■■ In *Hypnosis*, youths drive a truck around late at night, apparently attempting to hypnotize tobacco company executives by playing recordings such as "I am a good person." Lorillard argues that *Hypnosis* sends the message that "tobacco executives are greedy and are bad people."[130] They argue that *Hypnosis* "crosses well into the realm of negative depiction, negative criticism, and disparagement of tobacco company employees."[131] Even though *Hypnosis* may be negative and may be critical, it is not vilifying. Calling someone greedy is not equivalent to calling someone a racist or a sexual abuser of children or a rapist. The negative implication that the sleeping executives are bad people is too far removed from a direct, confrontational attack to be considered vilification.

The message in *Hypnosis* is also toned down by the use of humor. For example, the youths go through a drive-thru window of a fast food restaurant and, instead of ordering food, they asked whether tobacco executives live in the area. Clearly, if the youths were intent on actually hypnotizing

tobacco company executives, they would have researched where they live and driven straight there. Asking a fast food worker where tobacco company executives live is merely a comical diversion intended to grab a television viewer's attention.

Thus, *Hypnosis* does not violate the anti-vilification clause of the MSA.

### c. *Product Recall*

■■■ In *Product Recall*, an actor purporting to be a tobacco company executive claims to be recalling all cigarettes and states that all cigarettes will stay off the market until the industry can, with a clear conscience, offer a safe product. At the end of the ad, a voiceover says "April fools." Lorillard claims *Product Recall* "mocks and ridicules tobacco company employees and negatively depicts them as callous, uncaring, and without a conscience." As with the other ads, *Product Recall* may be negative and may be critical, but it is not vilifying. Tobacco is certainly not a safe product; indeed, Lorillard does not contradict the claim that the use of tobacco kills 1,200 people each day. The ad's implication that the tobacco industry and, by extension, tobacco company executives, do not have a clear conscience about the safety of tobacco products is, at most, a mild rebuke—not vilification.

Moreover, *Product Recall* does interject humor into its message. Most obvious is the use of the tag line "April fools" which has historically been an indication of a joke being played on someone. Here, the tag line may be viewed as sarcastic, but, even so, the ad does not present a straightforward indictment of the tobacco industry or a particular tobacco company executive. Indeed, Lorillard offers no proof that the

---

130. *Id.* at 70.

131. *Id.*

actor actually did resemble a particular tobacco company executive.

Therefore, *Product Recall* does not violate the anti-vilification clause of the MSA.

#### d. *Dog Walker*

██ In *Dog Walker*, a telephone caller asks a tobacco employee if the company is interested in buying dog urine to add to its supply of urea for the manufacture of cigarettes. Lorillard contends that *Dog Walker* "ridicules Lorillard's employees and casts them in a negative light." [132] Lorillard's entire argument about this ad is focused on the use of the term "dog urine." Lorillard concedes that another ALF advertisement which states that cigarettes contain urea is not vilifying. What Lorillard does take issue with in *Dog Walker* is the implication that cigarettes contain dog urine. This is a minor point, especially because the ad does not expressly state that cigarettes contain dog urine. The caller merely gives the impression that a tobacco company could extract urea from dog urine and put it into cigarettes. Apparently, urea is common to both dog urine and cigarettes. The fact that the ad illustrates this point does not make the ad vilifying.

In addition, the tone of the ad is irreverent, especially when the caller offers Lorillard different breeds of urine. Just the fact that the caller offers high-test Rottweiler pee shows the comical side of the ad. If urea is present in dog urine, why would it matter if the urine were high-test or from a specific breed? The caller's offer is clearly meant as a joke that could not be taken seriously by any reasonable listener.

Thus, *Dog Walker* does not violate the anti-vilification clause of the MSA.

#### e. *SCUM*

██ In *SCUM*, an actor states that a tobacco marketing plan targeting homosexuals and homeless people was known by the acronym "SCUM." Lorillard contends that *SCUM's* intended message was that "tobacco companies and their employees are callous, uncaring people who hold their customers or potential customers in contempt." [133] While *SCUM* does deal with at least one issue frequently mentioned in vilification cases, homosexuality, the ad does not vilify Lorillard. *SCUM* is easily distinguished from the facts of other cases in which demeaning talk about homosexuality is considered vilification. Here, ALF does not contend that any tobacco company employees are homosexuals or that they should act more "manly." *SCUM* only portrays the tobacco industry's view of potential consumers with a specific sexual orientation. *SCUM* does not state that tobacco company employees have a specific sexual orientation or should have a specific sexual orientation. The ad only illustrates a marketing plan by tobacco companies. Thus, *SCUM* does not violate the anti-vilification clause of the MSA.

#### f. *The Remaining Ads* [134]

██ After a review of the remaining 15 ads at issue, the court finds that none of them violate the anti-vilification clause of the MSA. Each of them portrays tobacco and the tobacco industry in a negative light, but those portrayals, without more, do not rise to the level of vilification. For example, in *Body Bag Memorial*, youths create a memorial in Washington, D.C. out

---

132. Def.'s Opening Br. at 73.

133. *Id.* at 74.

134. Lorillard does not brief the vilification aspect of the remaining ads, choosing instead to rely on the five detailed ads above.

of body bags, each of which represents a person who dies every day from tobacco products. The implication is that smoking kills. The same implication is clear in *Choice*, a serious ad in which a smoker with a terminal illness states that she is going to die.

ALF's ad campaign consists of a group of cohesive messages: tobacco companies target young consumers to begin smoking, tobacco companies manipulate the chemical composition of cigarettes to increase the addictiveness of the nicotine, and smoking kills. None of these messages violate the anti-vilification clause of the MSA. The messages are based on well known public facts. Anyone can view the Centers for Disease Control and Prevention's website, which states that "[t]obacco use is the leading preventable cause of death in the United States" [135] and that "[m]ore deaths are caused each year by tobacco use than by all deaths from human immunodeficiency virus (HIV), illegal drug use, alcohol use, motor vehicle injuries, suicides, and murders combined." [136] And people have known for years that cigarette companies marketed to children,[137] especially through cartoons [138] and candy-flavored cigarette look-a-likes.[139]

Even the ads that involve tobacco industry employees do not constitute vilification. None of the ads subject the employees to the type of contemptuous language contained in other case law discussing vilification. There are no scurrilous and vitriolic attacks. There is no cruel slander. There is no social ostracism. There is no public ridicule, traduction, or calumny. Although the employees may be described, either explicitly or implicitly, as liars, greedy executives, or authors of embarrassing documents, the ads do not vilify them.

Furthermore, many of ALF's ads do not have a serious tone. The ads frequently employ humor to grab viewer attention. Some examples of the silliness or absurdity contained in the ads are water ice flavored with ammonia, a night club in which a woman is making a sexual overture to a body bag, and a game show in which young people are challenged by the spelling of ammonia. These ads clearly use preposterous situations as an attention-getting mechanism to contrast historical misrepresentations from the tobacco industry with current knowledge about the dangers of tobacco products.

135. http://www.cdc.gov/tobacco/factsheets/Tobacco_ Related_Mortality_factsheet.htm

136. *Id.*

137. http://releases. usnewswire.com/ printing.asp?id =41016 ("After two years of denying responsibility for its actions, RJ Reynolds Tobacco Company has finally agreed to settle a lawsuit filed against the company by the state of California. Originally convicted in 2002 of violating the 1998 Tobacco Settlement by marketing to kids in California, RJR has now agreed to limit its tobacco advertising in magazines with large youth readership and avoid publications with at least 15 percent teen readership.").

138. http://www.usa today.com/news/smoke /smoke50.htm (reporting in 1997 that "R.J. Reynolds Tobacco Co. has agreed to pay California communities $10 million to settle a lawsuit accusing it of targeting children with Joe Camel."). Obviously, the tobacco companies conceded this point when they signed the MSA. *See also* MSA § III(b) at 19 ("No [tobacco company] may use or cause to be used any Cartoon in any advertising, promoting, packaging, or labeling of Tobacco Products.").

139. http://www.mass. gov/dph/media/20 04/ pr0520.htm ("Massachusetts Department of Public Health Commissioner Christy Ferguson today called on the major tobacco manufacturers to put a stop to marketing and sale of candy flavored cigarettes in the Commonwealth because the cigarettes may make it easier for teenagers to take up smoking.").

Therefore, the court finds that none of the ads violate the anti-vilification clause of the MSA.

### C. *Legal Definitions Of Personal Attack* [140]

#### 1. *Case Law*

There are many fewer relevant instances of "personal attack" than "vilification" in the case law. For example, in Delaware, there appears to be only one case with a factual situation that could shed light on the meaning of "personal attack" in the context of the MSA. In *Skouras v. Admiralty Enterprises, Inc.*, the Delaware Supreme Court labeled as a personal attack letters from the plaintiff to various governmental and business entities that threatened charges of wrongdoing by the defendant's directors and officers.[141] The letters appear to be sent in connection with allegations of fraud, tax evasion, and corporate mismanagement.[142]

The United States Supreme Court has a similar lack of "personal attack" case law that would be relevant to this case. In one relevant case, however, the Court found that "[the high school principal] could reasonably have concluded that the students who had written and edited these articles had not sufficiently mastered those portions of the Journalism II curriculum that pertained to the treatment of controversial issues and personal attacks, the need to protect the privacy of individuals whose most intimate concerns are to be revealed in the newspaper, and 'the legal, moral, and ethical restrictions imposed upon journalists within [a] school community' that includes adolescent subjects and readers." [143]

The *Hazelwood* case also highlights another important issue here. Not

---

**140.** Courts use the phrase "personal attack" in three distinct legal contexts. First, courts use "personal attack" to refer to physical violence. *See, e.g., Lowell v. Commissioner*, 26 T.C.M. (CCH) 366 (1967) ("Petitioner's testimony indicates that most or all of these claimed expenses were made necessary by an unwarranted personal attack on him in April 1964 when at four o'clock on a Saturday afternoon petitioner was lying on a couch in his home and a man by the name of Chester Napierkowski walked in and hit him in the eye."). Second, courts use "personal attack" to refer to courtroom behavior. *See, e.g., In re Hillis*, 858 A.2d 317, 323 (Del.2004) ("Professional civility is conduct that shows respect not only for the courts and colleagues, but also for all people encountered in practice. Respect requires promptness in meeting appointments, consideration of the schedules and commitments of others, adherence to commitments whether made orally or in writing, promptness in returning telephone calls and responding to communications, and avoidance of verbal intemperance and personal attacks.") (quoting PRINCIPLES OF PROFESSIONALISM FOR DELAWARE LAWYERS No. 4); *In re Shearin*, 765 A.2d 930, 938 (Del.2000) (stating that "members of the Delaware Bar are subject to disciplinary sanctions for speech consisting of intemperate and reckless personal attacks on the integrity of judicial officers."); *Mayberry*, 400 U.S. at 457, 458, 460, 91 S.Ct. 499 (describing as personal attacks statements such as calling the judge a "tyrannical dog," stating that the judge needed "some kind of psychiatric treatment," and telling the judge to keep his mouth shut). Both of the first two contexts are inapplicable to the facts of this case. Obviously this case is not about physical violence. This case is also not about courtroom behavior. As the Delaware Supreme Court and the United States Supreme Court have made clear, civility in the courtroom is a matter of special interest in the law. Therefore, this court will confine its analysis of personal attack to the third legal context, in which courts discuss communications that occur outside of the courtroom.

**141.** 386 A.2d 674, 679 (Del.Ch.1978).

**142.** *Id.* at 679.

**143.** *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 276, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

**34**

only should this court be concerned with what constitutes "attack," it should also be concerned with what constitutes "personal." In *Hazelwood*, the court linked the concept of personal attack to the concept of individual privacy. The idea that the analysis of what constitutes a personal attack depends on context is explored more fully in *Monitor Patriot Co. v. Roy*, where the Court made clear that if an individual exposes his private life to the public, he loses the ability to call his private life a purely private concern.[144]

In addition, the United States Supreme Court has used the phrase "personal at-

tack" in a line of cases concerning the Federal Communications Commission ("FCC"). The FCC cases are based on the FCC's personal attack rule, pursuant to which broadcasters must "notify victims of on-air personal attacks and [] provide victims with opportunity to respond over the air."[145] Lorillard does, however, note that this rule has since been repealed.[146]

Turning to the federal case law, the court finds that there are many more cases concerning the phrase "personal attack."[147] The majority of these cases concern statements that are much stronger than criticism. In one case, for example,

144. 401 U.S. 265, 273–74, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).

145. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 650 n. 7, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citing 47 C.F.R. § 73.1920 (1993)). *See also Buckley v. Valeo*, 424 U.S. 1, 49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court upheld the political-editorial and personal-attack portions of the Federal Communications Commission's fairness doctrine."); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) ("The 'personal attack' rule provides that 'when, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person,' the licensee must notify the person attacked and give him an opportunity to respond.").

146. Def.'s Opening Br. at 61.

147. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 695–96 (7th Cir.2002) (describing as personal attacks the accusations that "School Board members [were] 'living high on the hog'· and [that] School Board members [were] spending taxpayer money on business trips."); *Kopp v. Samaritan Health Sys.*, 13 F.3d 264, 268 (8th Cir.1993) (listing the incredibly derogatory remarks about female co-workers, called "personal attacks," including comments about

their weight and specific references to female anatomy); *Smith v. Cleburne County Hospital*, 870 F.2d 1375, 1382 (8th Cir.1989) (labeling as caustic personal attacks statements that individuals were "political flunkies who ... held contempt toward concerned citizens"); *Hesse v. Bd. of Educ.*, 848 F.2d 748, 750 (7th Cir.1988) (describing memoranda written to school officials that were "often sarcastic, unprofessional and insulting in nature" as personal attacks); *Falwell v. Flynt*, 805 F.2d 484, 484 (4th Cir.1986) (Wilkinson, J., Phillips, J., Sprouse, J., Ervin, J., Winter, J., dissenting), *rev'd sub nom, Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (describing as a personal attack the famous ad parody by *Hustler* magazine that implies an incestuous rendezvous between the Reverend Jerry Falwell and his mother in an outhouse); *Weinman v. Local 40 of Int'l Asso. of Bridge, Structural etc.*, 1974 WL 1123, at *6, 1974 U.S. Dist. LEXIS 7553, at *16 (S.D.N.Y.1974) (describing as a personal attack comments at a union meeting that likened the plaintiffs to cancer that should be cut out); *United States v. Barlow*, 56 F.Supp. 795, 797 (D.Utah 1944) (calling these descriptions personal attacks: "a mental and physical bastard, a black hearted coward, a liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy· and for much less silver than Judas betrayed the Saviour.") (citing *Swearingen v. United States*, 161 U.S. 446, 446, 16 S.Ct. 562, 40 L.Ed. 765 (1896)); *In re First City Bancorporation*, 282 F.3d 864, 866 (5th Cir.2002) (calling directors scoundrels and labeling an executive compensation plan a bribe).

instead of criticizing the politics of a group of individuals, a person called them "political flunkies." In another example, members at a union meeting were compared to cancer. A more recent example in the corporate context is a case in which directors were called scoundrels and their executive compensation plan was referred to as a bribe. As these cases show, the federal courts do not equate personal attack with criticism. Instead, the federal courts use the phrase "personal attack" when categorizing statements that include comparing people to terminal illnesses or alleging that they are criminals.

Few federal cases have addressed the "personal" aspect of personal attack. Perhaps the most relevant case is *Evans*, in which the court explored in detail the difference between personal and nonpersonal attack. The *Evans* court analyzed the difference as follows:

> After careful consideration and analysis of the problem, this court holds that people who, by assuming their leadership role, may be classified as organization figures, have decreased their right to privacy and freedom from defamation. These rights, however, have been decreased only with respect to the other members of or people who have a direct, substantial, and significant interest in the same organization. Following *New York Times* and *Butts*, the Constitution-

al limitation of the protection afforded by the laws of defamation extends only to comments, criticism, and dissent with respect to this particular individual's capacity and function within the organization. Only criticism of an individual in his official capacity will be privileged. Personal attacks will not be tolerated by the courts. Thus, comments and criticism of an organization's top leaders, by members of the same organization or by outside individuals whose relationship to the organization is direct, substantial, and significant, to other members of the same organization or people having a direct, substantial, and significant interest in this organization which concern actions, decisions, policy and other related matters taken, done, or acted upon by these people in their official capacity will be protected and privileged.[148]

Turning to state case law, the court finds that there are few cases in which the courts use the phrase "personal attack" to refer to statements.[149] In these cases, the statements are, like in the federal cases, much stronger than criticism. For example, alleging that a person is trying to disown his child. Another example is challenging the character or fitness of a police officer as a man.

State courts also address the "personal" aspect of personal attack.[150] In fact, the

---

148. *Evans v. Lawson*, 351 F.Supp. 279, 286 (D.Va.1972).

149. *Ptaszek v. Michalik*, 238 Ill.App.3d 72, 179 Ill.Dec. 283, 606 N.E.2d 115, 122 (1992) (Jiganti, J., dissenting) (characterizing as a personal attack labeling the plaintiff "as a person who is trying to disown his child"); *Sparks v. Boone*, 560 S.W.2d 236, 239 (Ky.Ct. App.1977) (describing as a personal attack challenging a police officer's "fitness and character as a man").

150. *Miami Herald Publ'g Co. v. Brautigam*, 127 So.2d 718, 722 (Fla.Dist.Ct.App.1961)

(describing personal attacks as "on private character") (citing NEWELL ON SLANDER AND LIBEL 516 (4th ed.)); *Hills v. Press Co.*, 122 Misc. 212, 202 N.Y.S. 678, 681 (N.Y.Sup. 1924) (describing personal attacks as "upon private character"); *Woodell v. Ormet Primary Aluminum*, 156 Ohio App.3d 602, 808 N.E.2d 402, 410 (2004) (describing as "scandalous and offensive personal attacks" graffiti that makes outrageous, sexually-explicit comments about individuals); *Sherman v. Int'l Publ'ns, Inc.*, 214 A.D. 437, 445, 212 N.Y.S. 478 (1925) (describing personal attacks as "on private character") (citing NEWELL ON SLANDER AND LI-

state courts have more fully developed case law with regard to the difference between public and private concerns. Most of the case law is found in discussions about libel and slander, quoting extensively from a treatise on the subject.[151] The operative phrase in most of these cases is "personal attack on private character."

### 2. Law Reviews

Turning to law reviews, the court finds that articles which use the term "personal attack" are consistent with the case law listed above.[152]

### 3. Dictionaries

As with vilification, both parties rely heavily on dictionary definitions in their briefing on the meaning of "personal attack." They both argue that "personal attack" is not a legal term of art and has not been defined in any relevant case law.[153] Thus, the parties request that the court confine its analysis to the "usual and ordinary meaning" (i.e. dictionary definition) of "personal attack" in order to interpret the MSA properly.[154] Although the parties may agree that an analysis of leading dictionaries provides the proper method of interpretation, they do not agree on the actual meaning of "personal attack."

ALF claims that dictionaries describe personal attacks as "hostile in tone or manner"[155] and "take their reason from private or intimate matters unrelated to the targeted individual's public role."[156] ALF turns first to the definition of "attack" before addressing the definition of "personal."

For "attack," ALF begins with definitions from the American Heritage Dictionary, which defines "attack" as "1. The act or an instance of attacking; an assault. 2. An expression of strong criticism; hostile

BEL 516 (4th ed.)); *Hall v. Binghamton Press Co.*, 29 N.Y.S.2d 760, 768 (N.Y.Sup.1941), *rev'd*, 263 A.D. 403, 33 N.Y.S.2d 840 (N.Y.App.Div.1942), *aff'd*, 296 N.Y. 714, 70 N.E.2d 537 (N.Y.1946) (describing personal attacks as "on the private character"); *Wood v. Boyle*, 177 Pa. 620, 35 A. 853, 853 (1896) (describing a publication as a "personal attack upon the plaintiff in his private, individual and personal capacity"); *Black v. State Co.*, 93 S.C. 467, 77 S.E. 51, 57 (1913) (describing personal attacks as "on private character").

**151.** The oft-quoted treatise is NEWELL ON SLANDER AND LIBEL (4th ed.).

**152.** Erica Hepp, Note, *Barking Up The Wrong Channel: An Analysis of Communication Law Problems Through The Lens Of Media Concentration Rules*, 85 B.U.L.REV. 553, 573 (2005) (labeling as a personal attack the statement that FCC Chairman Michael Powell would have made a "great minister of information" for Saddam Hussein); Captain John A. Carr, USAF, *Free Speech in the Military Community: Striking a Balance Between Personal Rights and Military Necessity*, 45 A.F.L.REV. 303, 336–37 (1998) (describing as a personal

attack an Air Force Major's comments that "President Clinton [is] a 'dope-smoking,' 'skirt-chasing,' 'draft-dodging' Commander-in-Chief"); Henry T. King, Jr., *Robert Jackson's Transcendent Influence Over Today's World Name*, 68 ALB. L.REV. 23, 28 (2004) (characterizing as a personal attack on the Nüremburg prosecutor the description of the Nüremburg Trials a high-grade lynching party).

**153.** Pl.'s Supplemental Brief at 1 n. 1 ("Neither party in this case has ever suggested that the pertinent terms are legal terms of art or have a settled legal definition."); Def.'s Answering Br. at 1 ("Neither party contends that personal attack or vilification are terms of art or are somehow used in the MSA in sense other than their usual and ordinary ones.").

**154.** *See* note 109.

**155.** Pl.'s Opening Br. at 45.

**156.** *Id.* at 45. ALF describes personal attack as "a bitter, fierce, or hostile statement relating to private or intimate aspects of an individual's life." Pl.'s Supplemental Br. at 1.

comment." [157] ALF also quotes the *Oxford English Dictionary*, which defines "attack" as "3. An assault with hostile or bitter words, or action intended to overthrow, injure, or defame." [158] In addition, ALF quotes the *Random House Dictionary*, which defines "attack" as "the act of attacking; onslaught; assault" or "3. to blame or abuse violently or bitterly. 4. to direct unfavorable criticism against; criticize severely; argue with strongly. 5. to try to destroy, esp. with verbal abuse." [159] Nowhere does ALF explain why it offers only some of the definitions under "attack," instead of all.

ALF then moves on to define "personal" using the same dictionaries. The *American Heritage Dictionary* defines "personal" as "2b. Done to ... a particular person" and "3. Concerning a particular person and his or her private business, interests, or activities; intimate. 4a. Aimed pointedly at the most intimate aspects of a person, especially in a critical or hostile manner; an uncalled-for, highly personal remark." [160] The *Oxford English Dictionary* defines "personal" as "[h]aving an individual person as object; relating to a person in his individual capacity; directed to, aimed at, or referring to some particular person or to oneself personally, spec. in a disparaging or offensive sense or manner." [161]

ALF stitches all of these definitions together to make one complete definition of "personal attack." Under its definition, "in the context of the MSA, a 'personal' attack could conceivably be a hostile or aggressive verbal act directed to some particular individual as opposed to another target or one that aims at purely private issues, as opposed to public ones." [162]

To support its definition of "personal attack," Lorillard cites to the same dictionaries that it did for "vilification," one of which is the same one cited by ALF. Lorillard, like ALF, splits its analysis into two parts, one for "attack" and one for "personal."

Lorillard quotes from the *American Heritage Dictionary* to define "attack" as "[a]n expression of strong criticism; hostile comment; vicious attacks in all the newspapers." [163] Although Lorillard quotes an older version of the *American Heritage Dictionary*, it uses the *exact same language* relied on by ALF for its definition of "attack," at least partially. [164] In addition to the *American Heritage Dictionary*, Lorillard cites the following three dictionaries:

- *Webster's Third New International Dictionary of the English Language* (Unabridged) (3d ed.1993) (defining "attack" as "[a]n assault with unfriendly or bitter words.")

---

157. *Id.* at 45 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 115 (4th ed.2000)).

158. *Id.* at 45 (quoting OXFORD ENGLISH DICTIONARY 760 (2d ed.1989)).

159. *Id.* at 45 (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 133 (2d ed.1987)).

160. *Id.* at 47 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1311 (4th ed.2000)).

161. *Id.* at 46–47 (quoting OXFORD ENGLISH DICTIONARY 599 (2d ed.1989)).

162. *Id.* at 47.

163. Def.'s Opening Br. at 60 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992)).

164. Both parties cite to the second definition of "attack" (i.e. an "expression of strong criticism; hostile comment"), but they do not cite the remaining sections of the definition in the same manner.

- *Webster's Ninth New Collegiate Dictionary* (1987) (defining "attack" as "[a] belligerent or antagonistic action.").

- *The New Oxford American Dictionary* (2001) (defining "attack" as "[c]riticize or oppose fiercely and publicly.").

Lorillard relies on just one dictionary for its definition of "personal." It argues that *The New Oxford American Dictionary* defines "personal" as "of or relating to a particular person; private."[165] Lorillard further argues, without either legal or dictionary support, that the word "personal" is expressly expanded by Section VI(h) of the MSA "to include attacks against entities and collective attacks."[166]

The combined result of Lorillard's dictionary analyses is that "a 'personal attack' under the MSA captures accusations that someone (or some group of persons or some entity) is greedy, immoral, callous, uncaring, unsympathetic, evil, untrustworthy, and so on."[167] Lorillard goes on to argue that its interpretation of "personal attack" is consistent with the FCC's meaning under the fairness doctrine. "Under the FCC's rules, [now repealed,] a 'personal attack' was defined as 'an attack made upon the honesty, character, integrity or like personal qualities of an identified person or group.'"[168]

### 4. What Is The Meaning Of "Personal Attack"?

A comprehensive review of case law, law reviews, and dictionaries demonstrates that there is no blackletter law definition of "personal attack." What is clear is that there is a range of meanings for "personal attack," both in the legal and nonlegal contexts.

■■■ The court starts with interpreting the phrase "personal attack" in Delaware case law. Delaware courts, while not defining "personal attack," have used the term in at least one discussion applicable here that concerned fraud, tax evasion, and corporate mismanagement. Clearly, the term goes beyond simple criticism.

A review of federal and state case law supports this court's interpretation of "personal attack." The vast majority of federal and state cases that discuss "personal attack" include modifiers or complete discussions that increase the intensity of a personal attack well beyond any simple criticism. For example, telling a judge that he needs psychiatric treatment or calling someone a crook go far beyond criticism. Additionally, these statements are not related to the job or official duties of the target of the speech and are therefore clearly personal.

Law reviews also support the court's interpretation that "personal attack" goes beyond simple criticism. The articles quoted above use "personal attack" in conjunction with invective such as calling the President a "dope-smoking, skirt-chasing, draft-dodging Commander-in-Chief," or linking the FCC Chairman to Saddam Hussein. Not only are these uses much stronger than simple criticism, they plainly go beyond the job or official capacity of the target.

■■■ Lorillard could rely on certain cases that term "liar" a personal attack. First, the accusation of lying is personal because it goes to an individual's character. Second, it is an attack because it goes

---

**165.** *Id.* at 60 (quoting The New Oxford American Dictionary 1351 (2001)).

**166.** *Id.* at 60.

**167.** *Id.* at 61.

**168.** Def.'s Opening Br. at 61.

beyond mere criticism. But after reviewing the case law, the court finds that, in the majority of cases that include lying or the accusation of being a liar, the context is much more serious and lying is amplified by other surrounding facts. For example, in *Barlow*, an individual is accused not only of being a liar, but a "willful, malicious and cowardly liar." [169] The naked accusation that someone is a liar therefore does not appear to rise to the level of personal attack.

There are, of course, some less strongly worded definitions of the phrase "personal attack." But those definitions are selectively chosen by Lorillard to make a point. After an extensive review of legal precedent, it is clear that a personal attack is not just criticism.[170]

Just as they did with "vilification," both parties cite heavily to dictionaries, often the same dictionary and the same words to define "attack." [171] They both quote the *American Heritage Dictionary* to define "attack" as "an expression of strong criticism; hostile comment." If the court were to rely on dictionary definitions in this case, the court suspects that the litigation would devolve into an argument about the meaning of the words used in the defini-

tion itself. If both parties agree that "hostile comment" is an accurate definition of "personal attack" but disagree about its meaning, how can the court look to the dictionary to differentiate the arguments? The answer is that it cannot. Thus, the court will look primarily to case law as the appropriate starting point. Although not clearly defined, "personal attack" appears in a variety of cases that give context to this court's understanding of the meaning of Section VI(h) of the MSA.

■ The court also notes that even if an ad were an attack, it must be personal as well in order to violate the MSA. By "personal," the court means that the ad must concern subject matter that is separate from the target's commercial aspect, whether it is the target's business or employment. Additionally, the target of the attack must be a specific individual or specific company.

■ Although ALF argues that "personal" relates only to individuals, entities can also be subject to personal attack. In *First City*, the court implied that the assertion that one law firm was the stooge of another law firm as a personal attack.[172] In *Smith Property*, the court called the allegations that the government was en-

---

**169.** *Barlow*, 56 F.Supp. at 797 (quoting *Swearingen:* "a black hearted coward, a liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy and for much less silver than Judas betrayed the Saviour. Time and again has he been proven a willful, malicious and cowardly liar.").

**170.** *See Pilkington v. Bevilacqua*, 439 F.Supp. 465, 477 (D.R.I.1977), *aff'd*, 590 F.2d 386 (1st Cir.1979) ("The plaintiff's statements ... were principled criticisms not personal attacks."); *Donovan v. Wilson Sporting Goods Co.*, 285 F.2d 714, 718 n. 6 (1st Cir.1961) (listing as personal attacks, "irresponsible statements, insidious assertions, and [guileful] allegations").

**171.** The court does, however, discount the cases cited by ALF to support its dictionary

definitions of personal attack since the cases do not deal with competing dictionary definitions. In *Cisneros v. U.D. Registry, Inc.*, the court cited the *American Heritage Dictionary* in defining the word "personal." 39 Cal. App.4th 548, 46 Cal.Rptr.2d 233, 247 (1995). It relied on the same definition "personal" that is offered here, "of or pertaining to a particular person, private, and concerning a particular individual and his intimate affairs." *Id.* (quoting the *American Heritage Dictionary* ). But the *Cisneros* court does not appear to have been presented with competing dictionary definitions.

**172.** *In re First City Bancorporation*, 282 F.3d at 866.

gaging in litigation to deplete the other party's resources a personal attack on the government.[173] In *Ultracashmere,* the court found that the vexatious litigation practices of a representative of one company amount to a personal attack on the other company.[174] Moreover, the express language of Section VI(h) foresees the possibility of personal attacks on companies.[175]

Finally, the court addresses the word "collectively" as it is used in Section VI(h). Plainly, the clause "whether individually or collectively" modifies all three of the potential targets of the attack (i.e. person, company, or governmental agency). Thus, the MSA facially proscribes a personal attack on a group of individuals or on a group of companies or on a group of governmental agencies. But this insight does not explain what constitutes a "personal attack" on a group of individuals or, in this case, companies.

While a personal attack generally targets an individual (i.e. a person), there is some case law that expands the concept to encompass entities such as companies. The case law reviewed by the court, however, refers only to personal attacks against particular and identified companies. Thus, for example, naming Lorillard in *Dog Walker* would satisfy this element of specific identification. By contrast, in *Lie Detector,* the reference to Rita, Vice President of Marketing of an unnamed tobacco company is not specific enough to satisfy this element.

▮ Lorillard is unable to cite any case law for the proposition that a personal attack can be made against a group of unnamed companies, even a group that is described collectively by affiliation, such as "Big Tobacco." As used in the MSA in the context of personal attack, "collectively" is most easily and appropriately understood to refer to a group of persons or companies specifically identified by name or other means of identification. Lorillard's argument that the word "collectively" prohibits attacks on "the tobacco industry" or "Big Tobacco" because the affiliation references would make the attacks personal reads restrictive language in the contract too broadly. If the court were to adopt Lorillard's position, the term "personal" would effectively be written out of Section VI(h) of the MSA. Every ad would fulfill the "personal" prong just by mentioning the word "tobacco." Obviously, this cannot be the proper interpretation of the MSA.

▮ The court concludes that the term "personal" in the MSA's "personal attack" consists of two parts. The first part concerns the target's private characteristics, such as, for an individual, amorality. The second part concerns the specific identification of the target. Case law clearly supports the interpretation that the target must be identified. The court finds that such identification must be specific to a particular person or company. Calling the tobacco companies "the tobacco industry" or "Big Tobacco" does not identify the signatories to the MSA in a specific enough manner to be violative of Section VI(h) of the MSA. Lorillard could have, but did not, achieve a broader prohibition in the MSA by referring to "Big Tobacco" or the tobacco industry specifically. It did not, and there is no reason to suppose that

**173.** *Smith Prop. Holdings, 4411 Conn. L.L.C. v. United States,* 311 F.Supp.2d 69, 76 n. 8 (D.D.C.2004).

**174.** *Ultracashmere House, Ltd. v. Nordstrom, Inc.,* 123 F.R.D. 435, 437 (D.N.Y.1988).

**175.** Section VI(h) ("[S]hall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.").

the 46 attorneys general would ever have agreed to such language.

### 5. Did ALF Violate The Personal Attack Clause Of The MSA?

The court now reviews each of the 20 ads to determine if any of them violated the personal attack prohibition of Section VI(h) of the MSA.[176] The descriptions of Lorillard's arguments may overlap with the analysis of "vilification" because Lorillard addresses its "personal attack" and "vilification" arguments simultaneously.

#### a. Shredder

The youths in *Shredder* use a megaphone to amplify their message to tobacco company employees inside a tobacco company building. Lorillard argues that the focus of the ad is on the employees and not on tobacco products, thus constituting a personal attack. While *Shredder* may expose tobacco company employees on camera, their faces are electronically obscured. No viewer would be able to identify any specific employee. Additionally, although the building in the ad is Philip Morris's headquarters, it is not identified as such. Therefore, since no person or company, is specifically identified, *Shredder* does not violate the personal attack clause of the MSA.

#### b. Hypnosis

In *Hypnosis*, youths drive a truck through a neighborhood where tobacco company executives allegedly live, playing hypnotic recordings such as "I am a good person." Lorillard argues that *Hypnosis* enters the personal realm of tobacco company executives. Instead of discussing to-

bacco products or tobacco companies, Lorillard argues, *Hypnosis* instead focuses on the greed of tobacco company employees and whether tobacco company employees are bad people. The court finds that this ad comes closest to violating the personal attack restriction of Section VI(h). The words in this ad are definitely stronger than simple criticism. And the van is purportedly driving around tobacco company employees' homes, making allegations about their private characteristics.

While *Hypnosis* comes close to violating Section VI(h), the court finds that it does not. Where a tobacco executive lives is not related to his or her job and is purely a personal matter. But *Hypnosis* is not personal under the MSA because it does not specifically attack any one person. Even Lorillard's dictionary definition states that personal means "relating to a particular person." The neighborhood in *Hypnosis* is a generic neighborhood. There is no evidence that any tobacco company employees actually live there.[177] Also, there is no specific tobacco employee against whom the ad is targeted. For this reason, *Hypnosis* does not violate the personal attack clause of the MSA.

#### c. Product Recall

In *Product Recall*, an actor portraying a tobacco executive claims to be recalling all cigarettes. The ad ends with a voiceover that says "April fools." Lorillard claims *Product Recall* "mocks and ridicules tobacco company employees and negatively depicts them as callous, uncaring, and without a conscience."[178] As discussed above, unless a particular person or

---

176. In its briefing, Lorillard concentrates its efforts on five ads: *Shredder, Hypnosis, Product Recall, Dog Walker,* and *SCUM.* For theses ads, Lorillard provides detailed analysis.

177. In addition, there is snow on the ground, an unusual circumstance where most tobacco companies are located.

178. Def.'s Opening Br. at 71.

particular entity is specifically identified, Lorillard cannot fulfill the "personal" prong of personal attack. Here, there is one person in the ad. While Lorillard argues that the actor was cast to "resemble an actual tobacco company CEO," it does not name which one.[179] Without a specific identification, Lorillard cannot support its claim of personal attack.

Moreover, Lorillard's argument disproves its claim. As Lorillard argues, "*Product Recall* . . . mocks and ridicules tobacco company employees."[180] Nowhere in the transcript of *Product Recall* is there any reference to employees or any particular employer or group of employees. All references are to the tobacco industry. While the court agrees with Lorillard that a company can be personally attacked, such an attack would necessarily be outside of the company's public role. But the ad is plainly focused on the health risk of cigarettes and does not address any issues that would be considered "personal" for either Lorillard or the industry in general.

Therefore, *Product Recall* does not violate the personal attack clause of the MSA.

### d. *Dog Walker*

■ In *Dog Walker*, a person phones a tobacco company and a tobacco company employee answers the phone "[g]ood afternoon, Lorillard." The caller then asks the employee if the company is interested in buying dog urine to get more urea. Lorillard maintains that *Dog Walker* "ridicules Lorillard's employees and casts them in a negative light."[181]

If Lorillard had contended that the *Dog Walker* ad was a personal attack because of the mention of Lorillard's name, this court most likely would have agreed. But at the summary judgment hearing, Lorillard eschewed that argument.[182] Instead, Lorillard's counsel argued that *Dog Walker* would be a "problem" if it said "Big Tobacco" because "people know who those [companies] are."[183] The court is at a loss to explain this reasoning. It is difficult to understand how identifying a group of companies as "Big Tobacco" would somehow be more "personal" than the specific identification of one company, namely Lorillard. Indeed, to the best of this court's knowledge, this entire litigation grew out of the *Dog Walker* ad and its specific reference to Lorillard.[184] But counsel conceded the point in the hearing and this court cannot make Lorillard's argument for it.[185] Thus, *Dog Walker* does not violate the personal attack clause of the MSA.

### e. *SCUM*

■ In *SCUM*, an actor describes a tobacco marketing plan that targets homosexuals and homeless people. He states that the plan was known by the acronym "SCUM." Lorillard argues that *SCUM's*

---

179. Def.'s Opening Br. at 71.

180. *Id.*

181. *Id.* at 73.

182. Tr. at 107:
   THE COURT: . . . Is the problem with the Dog Walker one that it identifies Lorillard?
   MR. PHILLIPS: Your Honor, I don't really think so.
   * * *
   MR. PHILLIPS: . . . as far as a violation of the MSA, I think not.

183. *Id.*

184. *Lorillard I*, 2002 WL 927383, at *2, 2002 Del. Ch. LEXIS 49, at *4 ("In response to [the *Dog Walker*] ad, in July 2001 Lorillard threatened to take legal action against [ALF].").

185. Section VI(h) ("[S]hall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.").

intended message was that "tobacco companies and their employees are callous, uncaring people who hold their customers or potential customers in contempt."[186] *SCUM* does not meet either the "personal" or "attack" prongs of personal attack. The actor in *SCUM* is only describing a fact, a fact that Lorillard does not deny. Additionally, *SCUM* does not target any particular person or company. Thus, *SCUM* does not violate the personal attack clause of the MSA.

### f. *The Remaining Ads*

Lorillard does not brief the personal attack aspect of the remaining ads, choosing instead to rely on the five detailed ads above. The court pauses here to address these ads before turning to the issue of ALF's website.

■ After a review of the remaining 15 ads at issue, the court finds that none of them violate the personal attack clause of the MSA. Each of them portrays tobacco companies and tobacco company employees in a negative light, but none of the ads specifically identify a target of an alleged attack.

ALF's ad campaign carefully does not mention any company or any employee by name nor does it refer to any identifiable group such as the CEOs by name or description.[187] Thus, their ads are in compliance with Section VI(h) of the MSA.

### 6. *ALF's thetruth.com Website*

The court next turns to ALF's website, which allows users to send "pissed off" libs.[188] Unlike the children's game in which kids innocently insert wrong words, creating ridiculous stories, the pissed off libs of ALF's website appear designed to create negative messages for tobacco company executives. For example, one pissed off lib contained the statement "It's bad enough that you ___ at Lorillard...." The same pissed off lib ended with the statement "May the lord have mercy on your pathetic ___." These emails were then sent to specific executives of tobacco companies.[189]

Lorillard argues that the pissed off libs functioned to provide web surfers with an easy and convenient way to send vulgar, profane, and vilifying emails to tobacco company executives. As proof, it cites many emails received by tobacco company employees that contain all manner of expletives and gross anatomy in the blank spaces listed above.[190] ALF maintained during the summary judgment hearing that it was not responsible for the filled-in content of the emails, arguing that it was protected by the Communications Decency Act.

■ The court finds that the emails generated by thetruth.com website constitute "personal attack" as it is used in Section VI(h) of the MSA. They are attacks because they go far beyond simple criticism. One of the example sentences of the boilerplate form provided by ALF states "It's bad enough that you ... knew that smoking cigarettes caused cancer, and

---

**186.** Def.'s Opening Br. at 74.

**187.** The one exception is the *Dog Walker* ad, as discussed above.

**188.** "Pissed off" libs is a reference to the game "Mad Libs." *See* Def.'s Opening Br. at 49, Ex. 101 (offering a "customized 'I'm not mad, I'm pissed off' lib letter"). In Mad Libs, children fill in a group of grammatically cor- rect words (plural noun, adjective, verb, etc.). The words are then inserted in a pre-format- ted story. The resulting completed story is often humorous and frequently absurd.

**189.** *See, e.g.,* Def.'s Ex. 111 (listing example emails).

**190.** *See, e.g.,* Def.'s Ex. 111.

kept selling them anyway, but to be deceptive about what you knew and ... try to cover it up is just plain _____." Even without any of the filled-in vulgarities from the numerous examples provided by Lorillard, this sentence is an attack on the recipient of the email. The sentence explicitly refers to covering up cigarettes' link to cancer, as well as making money from selling a product with known harmful effects. This content is not criticism. It is a scathing indictment of a person and a person's employment.

■ Moreover, the court finds that ALF is also responsible for the entire content of the emails, including any filled-in expletives, scatological references, and criminal insinuations. ALF created the website, designed its format, and provided web surfers with an easy method of ranting at tobacco company executives. All the web surfers had to do was fill in some dirty words and click the send button. The court rejects ALF's claim that it is not responsible for what web surfers entered into the emails. ALF's structure of the website and the email form was highly suggestive and makes it virtually impossible for anyone to fill out the email in a positive manner. Indeed, the evidence shows that web surfers filled in the foulest language possible. Any argument about the Communications Decency Act is irrelevant in this context, in which ALF is contractually bound not to utter certain communications that would violate the MSA.[191]

■ Furthermore, the court finds that the emails were also "personal" in regard to the "personal attack" prohibition of Section VI(h). ALF provided web surfers with a list of specific tobacco company executives to whom to send the emails. Thus, the emails were targeted on a very personal level, unlike the television ads that do not mention executives by name and are broadcast nationwide.

■ Although the website violates Section VI(h) of the MSA, the court declines to award Lorillard any relief because the violation was de minimis. Very soon after the emails were received by its employees, Lorillard put in place technology that effectively blocked further communications from ALF's website. The evidence reflects that Lorillard expended less than $1,000 to block the emails. Additionally, the pissed off libs function of the website has since been removed, so no more emails are being sent. For these reasons, the court will not award damages or injunctive relief connected to ALF's violation of Section VI(h) of the MSA.

### D. Funding ALF's Ad Campaign

Lorillard also argues that ALF cannot escape the vilification and personal attack

---

191. At the hearing, ALF argued that this court should look to Schneider v. Amazon.com, Inc., 108 Wash.App. 454, 31 P.3d 37, 39 (2001), to find that "[u]nder the Communications Decency Act of 1996(CDA), interactive computer service providers are immune from publisher liability." Even if that case were to apply here, ALF failed to inform the court about Amazon.com's restriction against "profanity, obscenities, or spiteful remarks." Id. at 38. Indeed, ALF's website appears to encourage such remarks. For that reason, ALF would be hard pressed to succeed in an argument that its actions related to the pissed off libs would come under "the 'good samaritan' blocking and screening of offensive material" section of the CDA discussed in Schneider. Id. at 39. Moreover, ALF argues that CDA immunity extends to breach of contract, but the cases it cites deal with the contract between the provider and the user, not between the provider and a third party, as is the case here. See Batzel v. Smith, 333 F.3d 1018, 1030 n. 14 (9th Cir.2003) (discussing the CDA provision that "insulates service providers from claims premised on the taking down of a customer's posting such as breach of contract or unfair business practices."). Here, ALF is bound to the MSA and is contractually prevented from personally attacking Lorillard or tobacco company executives. Thus, the CDA does not apply.

prohibition by using the Base Fund to fund its ads. ALF, on the other hand, argues that the Base Fund is separate from the NPEF and therefore not subject to the vilification and personal attack clause. ALF maintains that ads paid for by the Base Fund are immune from contractual liability under Section VI(h).

The court need not resolve the issue of funding the ads at this time. As discussed above, none of the contested ads violate Section VI(h), so the issue of what effect the method of funding has on the court's analysis is moot.

Nevertheless, it would appear as if ALF's position might constitute a violation of the implied covenant of good faith and fair dealing that inheres in every contract.[192] Although ALF may be technically correct that the prohibitions on the substance of the ads applies only to the NPEF, the MSA clearly reflects an understanding that the NPEF pays for ads and the Base Fund pays for ALF's administrative costs. Thus, ALF's gambit of using payment out of the Base Fund as a defense for Lorillard's claim that certain ads violate Section VI(h) would seem to deprive Lorillard of the bargain reflected in the structure of the MSA.

### E. The Three Criteria Clause

While ALF maintains that the three criteria clause remains part of this litigation, Lorillard appears to concede the issue.[193] Lorillard does not brief its position on the three criteria clause, most likely because it cannot seriously argue that the ads do not address the "addictiveness, health effects, and social costs related to the use of tobacco products." Nonetheless, the court will analyze the ads to see if they comport with the three criteria clause.

██ *Shredder* deals with social costs because it talks about enticing today's teenager to be tomorrow's customer. Similarly, *Bodega* and *Peer Pressure* focus on marketing to children, another social cost of tobacco. *Rip It Out* also touches on the social costs of tobacco smoking by referring to the phenomenal rate of growth of a hypothetical tobacco company. *SCUM* is also a social cost commercial because it talks about targeting the "sub-culture" people in society.

*Hypnosis* concerns the health effects of tobacco products because it mentions how many people die from tobacco-related illnesses. The same logic applies to *Body Bags* and *Body Bag Memorial*. Likewise, *Unclear* and *Choice* contain individual messages about smokers and the negative health effects of smoking. *Western* and *Night Club* touch on the health effects of tobacco products by using the imagery of body bags in the ads. *Baby Invasion* concerns the health effects of tobacco products by discussing secondhand smoke. *Product Recall* is also a health effect ad because it discusses various tobacco-related illnesses, such as emphysema and heart disease.

*Lie Detector* and *Congress* refer to the addictiveness of nicotine. *Ammonia Soul Train* and *Raspa* indirectly refer to the addictiveness of nicotine by the "impact" of nicotine. *Flavor Gendek* and *Dog Walker* also indirectly address the addictiveness of nicotine by referring to chemicals that are found in cigarettes.

After evaluating each of the contested ads individually, the court holds that none

---

192. *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 223 (Del.Supr.2005).

193. Def.'s Opening Br. at 59 ("Within [the second sentence of Section VI(h) of the MSA], the only words that are apparently in dispute are 'personal attack' and 'vilification.' ").

of them violate the three criteria clause of Section VI(h) of the MSA.

## V.

For the foregoing reasons, ALF''s motion for summary judgment is GRANTED and Lorillard's motion for summary judgment is DENIED. Counsel are directed to submit a form of Final Judgment, on notice, within 7 days of the date hereof. IT IS SO ORDERED.